REITMAN ET AL. *v.* MULKEY ET AL.

No. 483.   Argued March 20–21, 1967.—Decided May 29, 1967.

*Samuel O. Pruitt, Jr.,* argued the cause for petitioners. With him on the briefs was *William French Smith.*

*Herman F. Selvin* and *A. L. Wirin* argued the cause for respondents.   With them on the brief were *Fred Okrand, Joseph A. Ball* and *Nathaniel S. Colley.*

*Solicitor General Marshall,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging affirmance. With him on the brief were *Assistant Attorney General Doar, Ralph S. Spritzer, Louis F. Claiborne, Nathan Lewin* and *Alan G. Marer.*

Briefs of *amici curiae,* urging affirmance, were filed by *Thomas C. Lynch,* Attorney General, *Charles A. O'Brien,* Chief Deputy Attorney General, *Miles T. Rubin,* Senior Assistant Attorney General, and *Loren Miller, Jr., Howard J. Bechefsky, Philip M. Rosten* and *Harold J. Smotkin,* Deputy Attorneys General, for the State of California; by *Louis J. Lefkowitz, pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *George D. Zuckerman* and *Lawrence J. Gross,* Assistant Attorneys General, for the Attorney General of the State of New York; by *Gerald D. Marcus* for the California Democratic State Central Committee; by *Marshall W. Krause* for the American Civil Liberties Union of Northern California; by *Joseph B. Robison* and *Sol Rabkin* for the National Committee against Discrimination in Housing; and by *Abe F. Levy* for the United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) AFL–CIO, Region 6, et al.

MR. JUSTICE WHITE delivered the opinion of the Court.

The question here is whether Art. I, § 26, of the California Constitution denies "to any person . . . the equal protection of the laws" within the meaning of the Fourteenth Amendment of the Constitution of the United States.[1] Section 26 of Art. I, an initiated measure sub-

---

[1] Section 1 of the Fourteenth Amendment provides as follows:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

mitted to the people as Proposition 14 in a statewide ballot in 1964, provides in part as follows:

"Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses."

The real property covered by § 26 is limited to residential property and contains an exception for state-owned real estate.[2]

---

[2] The following is the full text of § 26: "Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.

"'Person' includes individuals, partnerships, corporations and other legal entities and their agents or representatives but does not include the State or any subdivision thereof with respect to the sale, lease or rental of property owned by it.

"'Real property' consists of any interest in real property of any kind or quality, present or future, irrespective of how obtained or financed, which is used, designed, constructed, zoned or otherwise devoted to or limited for residential purposes whether as a single family dwelling or as a dwelling for two or more persons or families living together or independently of each other.

"This Article shall not apply to the obtaining of property by eminent domain pursuant to Article I, Sections 14 and 14½ of this Constitution, nor to the renting or providing of any accommodations for lodging purposes by a hotel, motel or other similar public place engaged in furnishing lodging to transient guests.

"If any part or provision of this Article, or the application thereof to any person or circumstance, is held invalid, the remainder of the Article, including the application of such part or provision to other persons or circumstances, shall not be affected thereby and shall continue in full force and effect. To this end the provisions of this Article are severable." (Cal. Const., Art. I, § 26.)

The issue arose in two separate actions in the California courts, *Mulkey* v. *Reitman* and *Prendergast* v. *Snyder*. In *Reitman*, the Mulkeys, who are husband and wife and respondents here, sued under § 51 and § 52 of the California Civil Code [3] alleging that petitioners had refused to rent them an apartment solely on account of their race. An injunction and damages were demanded. Petitioners moved for summary judgment on the ground that §§ 51 and 52, insofar as they were the basis for the Mulkeys' action, had been rendered null and void by the adoption of Proposition 14 after the filing of the complaint. The trial court granted the motion and respondents took the case to the California Supreme Court.

In the *Prendergast* case, respondents, husband and wife, filed suit in December 1964 seeking to enjoin eviction from their apartment; respondents alleged that the eviction was motivated by racial prejudice and therefore would violate § 51 and § 52 of the Civil Code. Petitioner Snyder cross-complained for a judicial declaration that he was entitled to terminate the month-to-month tenancy even if his action was based on racial considerations. In denying petitioner's motion for summary

---

[3] Cal. Civ. Code §§ 51 and 52 provide in part as follows:

"All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

.    .    .    .    .

"Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code."

judgment, the trial court found it unnecessary to consider the validity of Proposition 14 because it concluded that judicial enforcement of an eviction based on racial grounds would in any event violate the Equal Protection Clause of the United States Constitution.[4] The cross-complaint was dismissed with prejudice [5] and petitioner Snyder appealed to the California Supreme Court which considered the case along with *Mulkey* v. *Reitman.* That court, in reversing the *Reitman* case, held that Art. I, § 26, was invalid as denying the equal protection of the laws guaranteed by the Fourteenth Amendment. 64 Cal. 2d 529, 413 P. 2d 825. For similar reasons, the court affirmed the judgment in the *Prendergast* case. 64 Cal. 2d 877, 413 P. 2d 847. We granted certiorari because the cases involve an important issue arising under the Fourteenth Amendment. 385 U. S. 967.

We affirm the judgments of the California Supreme Court. We first turn to the opinion of that court in *Reitman,* which quite properly undertook to examine the constitutionality of § 26 in terms of its "immediate objective," its "ultimate effect" and its "historical context and the conditions existing prior to its enactment." Judgments such as these we have frequently undertaken ourselves. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.,* 235 U. S. 151; *Lombard* v. *Louisiana,* 373 U. S. 267; *Robinson* v. *Florida,* 378 U. S. 153; *Turner* v. *City of Memphis,* 369 U. S. 350; *Anderson* v. *Martin,* 375 U. S. 399. But here the California Supreme Court has addressed itself to these mat-

---

[4] The trial court considered the case to be controlled by *Abstract Investment Co.* v. *Hutchinson,* 204 Cal. App. 2d 242, 22 Cal. Rptr. 309, which in turn placed major reliance on *Shelley* v. *Kraemer,* 334 U. S. 1, and *Barrows* v. *Jackson,* 346 U. S. 249.

[5] Respondents' complaint was dismissed without prejudice based on the trial court's finding that petitioner would not seek eviction without the declaratory relief he had requested.

ters and we should give careful consideration to its views because they concern the purpose, scope, and operative effect of a provision of the California Constitution.

First, the court considered whether § 26 was concerned at all with private discriminations in residential housing. This involved a review of past efforts by the California Legislature to regulate such discriminations. The Unruh Act, Civ. Code §§ 51–52, on which respondents based their cases, was passed in 1959.[6] The Hawkins Act, formerly Health & Safety Code §§ 35700–35741, followed and prohibited discriminations in publicly assisted housing. In 1961, the legislature enacted proscriptions against restrictive covenants. Finally, in 1963, came the Rumford Fair Housing Act, Health & Safety Code §§ 35700–35744, superseding the Hawkins Act and prohibiting racial discriminations in the sale or rental of any private dwelling containing more than four units. That act was enforceable by the State Fair Employment Practice Commission.

It was against this background that Proposition 14 was enacted. Its immediate design and intent, the California court said, were "to overturn state laws that bore on the right of private sellers and lessors to discriminate," the Unruh and Rumford Acts, and "to forestall future state action that might circumscribe this right." This aim was successfully achieved: the adoption of Proposition 14 "generally nullifies both the Rumford and Unruh Acts as they apply to the housing market," and establishes "a purported constitutional right to *privately* discriminate on grounds which admittedly would be unavailable under the Fourteenth Amendment *should state action* be involved."

Second, the court conceded that the State was permitted a neutral position with respect to private racial

---

[6] See n. 3, *supra.*

discriminations and that the State was not bound by the Federal Constitution to forbid them. But, because a significant state involvement in private discriminations could amount to unconstitutional state action, *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, the court deemed it necessary to determine whether Proposition 14 invalidly involved the State in racial discriminations in the housing market. Its conclusion was that it did.

To reach this result, the state court examined certain prior decisions in this Court in which discriminatory state action was identified. Based on these cases, *Robinson* v. *Florida,* 378 U. S. 153, 156; *Anderson* v. *Martin,* 375 U. S. 399; *Barrows* v. *Jackson,* 346 U. S. 249, 254; *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.,* 235 U. S. 151, it concluded that a prohibited state involvement could be found "even where the state can be charged with only encouraging," rather than commanding discrimination. Also of particular interest to the court was MR. JUSTICE STEWART's concurrence in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 726, where it was said that the Delaware courts had construed an existing Delaware statute as "authorizing" racial discrimination in restaurants and that the statute was therefore invalid. To the California court "[t]he instant case presents an undeniably analogous situation" wherein the State had taken affirmative action designed to make private discriminations legally possible. Section 26 was said to have changed the situation from one in which discrimination was restricted "to one wherein it is encouraged, within the meaning of the cited decisions"; § 26 was legislative action "which authorized private discrimination" and made the State "at least a partner in the instant act of discrimination . . . ." The court could "conceive of no other purpose for an application of section 26 aside from authorizing the perpetration of a purported private discrimination . . . ." The judgment

of the California court was that § 26 unconstitutionally involves the State in racial discriminations and is therefore invalid under the Fourteenth Amendment.

There is no sound reason for rejecting this judgment. Petitioners contend that the California court has misconstrued the Fourteenth Amendment since the repeal of any statute prohibiting racial discrimination, which is constitutionally permissible, may be said to "authorize" and "encourage" discrimination because it makes legally permissible that which was formerly proscribed. But, as we understand the California court, it did not posit a constitutional violation on the mere repeal of the Unruh and Rumford Acts. It did not read either our cases or the Fourteenth Amendment as establishing an automatic constitutional barrier to the repeal of an existing law prohibiting racial discriminations in housing; nor did the court rule that a State may never put in statutory form an existing policy of neutrality with respect to private discriminations. What the court below did was first to reject the notion that the State was required to have a statute prohibiting racial discriminations in housing. Second, it held the intent of § 26 was to authorize private racial discriminations in the housing market, to repeal the Unruh and Rumford Acts and to create a constitutional right to discriminate on racial grounds in the sale and leasing of real property. Hence, the court dealt with § 26 as though it expressly authorized and constitutionalized the private right to discriminate. Third, the court assessed the ultimate impact of § 26 in the California environment and concluded that the section would encourage and significantly involve the State in private racial discrimination contrary to the Fourteenth Amendment.

The California court could very reasonably conclude that § 26 would and did have wider impact than a mere repeal of existing statutes. Section 26 mentioned neither

the Unruh nor Rumford Act in so many words. Instead, it announced the constitutional right of any person to decline to sell or lease his real property to anyone to whom he did not desire to sell or lease. Unruh and Rumford were thereby *pro tanto* repealed. But the section struck more deeply and more widely. Private discriminations in housing were now not only free from Rumford and Unruh but they also enjoyed a far different status than was true before the passage of those statutes. The right to discriminate, including the right to discriminate on racial grounds, was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government. Those practicing racial discriminations need no longer rely solely on their personal choice. They could now invoke express constitutional authority, free from censure or interference of any kind from official sources. All individuals, partnerships, corporations and other legal entities, as well as their agents and representatives, could now discriminate with respect to their residential real property, which is defined as any interest in real property of any kind or quality, "irrespective of how obtained or financed," and seemingly irrespective of the relationship of the State to such interests in real property. Only the State is excluded with respect to property owned by it.[7]

---

[7] In addition to the case we now have before us, two other cases decided the same day by the California Supreme Court are instructive concerning the range and impact of Art. I, § 26, of the California Constitution. In *Hill* v. *Miller*, 413 P. 2d 852, on rehearing, 64 Cal. 2d 757, 415 P. 2d 33, a Negro tenant sued to restrain an eviction from a leased, single-family dwelling. The notice to quit served by the owner had expressly recited: "The sole reason for this notice is that I have elected to exercise the right conferred upon me by Article I Section 26, California Constitution, to rent said premises to members of the Caucasian race." Although the California court had invalidated § 26, the court ruled against the Negro

This Court has never attempted the "impossible task" of formulating an infallible test for determining whether the State "in any of its manifestations" has become significantly involved in private discriminations. "Only by sifting facts and weighing circumstances" on a case-by-case basis can a "nonobvious involvement of the State in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722. Here the California court, armed as it was with the knowledge of the facts and circumstances concerning the passage and potential impact of § 26, and familiar with the milieu in which that provision would operate, has determined that the provision would involve the State in

plaintiff because the Unruh Act did not cover single-family dwellings. Thus the landlord's reliance on § 26 was superfluous.

In *Peyton* v. *Barrington Plaza Corp.,* 64 Cal. 2d 880, 413 P. 2d 849, a Negro physician sued to require the defendant corporation to lease him an apartment in Barrington Plaza which was described in the opinion as follows:

"that defendant received a $17,000,000, low interest rate loan under the National Housing Act to construct Barrington Plaza; that such sum represents 90 percent of the construction costs of the plaza; that the development is a part of the urban redevelopment program undertaken by the City of Los Angeles; that Barrington Plaza is the largest apartment development in the western United States, providing apartment living for 2,500 people; that it includes many retail shops and professional services within its self-contained facilities; that it provides a fall-out shelter, completely stocked by the federal government with emergency supplies; that the plaza replaced private homes of both Caucasians and non-Caucasians; that the city effected zoning changes to accommodate the development; that the defendant's securities were sold, its construction contracts were let, its building permits were issued and its shops and professional services established all pursuant to state or local approval, cooperation and authority."

The defendant defended the action and moved for judgment on the pleadings based on Art. I, § 26, of the California Constitution. The motion was granted but the judgment was reversed based on the decision in *Mulkey* v. *Reitman.*

private racial discriminations to an unconstitutional degree. We accept this holding of the California court.

The assessment of § 26 by the California court is similar to what this Court has done in appraising state statutes or other official actions in other contexts. In *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.,* 235 U. S. 151, the Court dealt with a statute which, as construed by the Court, authorized carriers to provide cars for white persons but not for Negroes. Though dismissal of the complaint on a procedural ground was affirmed, the Court made it clear that such a statute was invalid under the Fourteenth Amendment because a carrier refusing equal service to Negroes would be "acting in the matter under the authority of a state law." This was nothing less than considering a permissive state statute as an authorization to discriminate and as sufficient state action to violate the Fourteenth Amendment in the context of that case. Similarly, in *Nixon* v. *Condon,* 286 U. S. 73,[8] the Court was faced with a statute empowering the executive committee of a political party to prescribe the qualifications of its members for voting or for other participation, but containing no directions with respect to the exercise of that power. This was authority which the committee otherwise might not have had and which was used by the committee to bar Negroes from voting in primary elections. Reposing this power in the executive committee was said to insinuate the State into the self-regulatory, decision-making scheme of the voluntary association; the exercise of the power was viewed as an expression of state authority contrary to the Fourteenth Amendment.

In *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, the operator-lessee of a restaurant located in a

---

[8] This case was a sequel to *Nixon* v. *Herndon,* 273 U. S. 536, which outlawed statutory disqualification of Negroes from voting in primary elections.

building owned by the State and otherwise operated for public purposes, refused service to Negroes. Although the State neither commanded nor expressly authorized or encouraged the discriminations, the State had "elected to place its power, property and prestige behind the admitted discrimination" and by "its inaction . . . has . . . made itself a party to the refusal of service . . ." which therefore could not be considered the purely private choice of the restaurant operator.

In *Peterson* v. *City of Greenville,* 373 U. S. 244, and in *Robinson* v. *Florida,* 378 U. S. 153, the Court dealt with state statutes or regulations requiring, at least in some respects, segregation in facilities and services in restaurants. These official provisions, although obviously unconstitutional and unenforceable, were deemed in themselves sufficient to disentitle the State to punish, as trespassers, Negroes who had been refused service in the restaurants. In neither case was any proof required that the restaurant owner had actually been influenced by the state statute or regulation. Finally, in *Lombard* v. *Louisiana,* 373 U. S. 267, the Court interpreted public statements by New Orleans city officials as announcing that the city would not permit Negroes to seek desegregated service in restaurants. Because the statements were deemed to have as much coercive potential as the ordinance in the *Peterson* case, the Court treated the city as though it had actually adopted an ordinance forbidding desegregated service in public restaurants.

None of these cases squarely controls the case we now have before us. But they do illustrate the range of situations in which discriminatory state action has been identified. They do exemplify the necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations. Here we are dealing with a provision which does not just repeal an existing law

forbidding private racial discriminations. Section 26 was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State. The California Supreme Court believes that the section will significantly encourage and involve the State in private discriminations. We have been presented with no persuasive considerations indicating that these judgments should be overturned.

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I add a word to indicate the dimensions of our problem.

This is not a case as simple as the one where a man with a bicycle or a car or a stock certificate or even a log cabin asserts the right to sell it to whomsoever he pleases, excluding all others whether they be Negro, Chinese, Japanese, Russians, Catholics, Baptists, or those with blue eyes. We deal here with a problem in the realm of zoning, similar to the one we had in *Shelley* v. *Kraemer*, 334 U. S. 1, where we struck down restrictive covenants.

Those covenants are one device whereby a neighborhood is kept "white" or "Caucasian" as the dominant interests desire. Proposition 14 in the setting of our modern housing problem is only another device of the same character.

Real estate brokers and mortgage lenders are largely dedicated to the maintenance of segregated communities.[1] Realtors commonly believe it is unethical to sell or rent to a Negro in a predominantly white or all-white neighborhood,[2] and mortgage lenders throw their weight along-

---

[1] Civil Rights U. S. A., Housing in Washington, D. C., U. S. Commission on Civil Rights 12–15 (1962).

[2] *Id.*, 12–13.

side segregated communities, rejecting applications by
members of a minority group who try to break the
white phalanx save and unless the neighborhood is in
process of conversion into a mixed or a Negro com-
munity.[3]   We are told by the Commission on Civil
Rights:

> "Property owners' prejudices are reflected, mag-
> nified, and sometimes even induced by real estate
> brokers, through whom most housing changes hands.
> Organized brokers have, with few exceptions, fol-
> lowed the principle that only a 'homogeneous'
> neighborhood assures economic soundness.   Their
> views in some cases are so vigorously expressed as
> to discourage property owners who would otherwise
> be concerned only with the color of a purchaser's
> money, and not with that of his skin. . . .[4]

> .        .        .        .        .

> "The financial community, upon which mortgage
> financing—and hence the bulk of home purchasing
> and home building—depends, also acts to a large
> extent on the premise that only a homogeneous
> neighborhood can offer an economically sound in-
> vestment.   For this reason, plus the fear of offend-
> ing their other clients, many mortgage-lending
> institutions refuse to provide home financing for
> houses in a 'mixed' neighborhood.   The persistent
> stereotypes of certain minority groups as poor credit

---

[3] *Id.*, 14–15.

[4] As the Hannah Commission said:
"Area housing patterns are sharply defined along racial lines.
Most members of the housing industry appear to respect them.
Although it is unlikely that these patterns are determined by formal
agreement, it is probable that they are maintained by tacit under-
standings." *Id.*, 15.

risks also block the flow of credit, although these stereotypes have often been proved unjustified." Housing, U. S. Commission on Civil Rights 2–3 (1961).

The builders join in the same scheme: [5]

". . . private builders often adopt what they believe are the views of those to whom they expect to sell and of the banks upon whose credit their own operations depend. In short, as the Commission on Race and Housing has concluded, 'it is the real estate brokers, builders, and mortgage finance institutions, which translate prejudice into discriminatory action.' Thus, at every level of the private housing market members of minority groups meet mutually reinforcing and often unbreakable barriers of rejection."

Proposition 14 is a form of sophisticated discrimination [6] whereby the people of California harness the energies of private groups to do indirectly what they cannot under our decisions [7] allow their government to do.

George A. McCanse, chairman of the legislative committee of the Texas Real Estate Association, while giving his views on Title IV of the proposed Civil Rights Act of 1966 (H. R. 14765), which would prohibit discrimination in housing by property owners, real estate brokers, and others engaged in the sale, rental or financing of housing, stated that he warned groups to which he spoke of "the grave dangers inherent in any type

---

[5] Housing, U. S. Commission on Civil Rights 3 (1961).

[6] Freedom to the Free, Century of Emancipation, Report to the President, U. S. Commission on Civil Rights 96 (1963).

[7] *City of Richmond* v. *Deans*, 281 U. S. 704.

of legislation that would erode away the rights that go with the ownership of property." [8]  He pointed out that

"[E]ach time we citizens of this country lose any of the rights that go with the ownership of property, we are moving that much closer to a centralized government in which ultimately the right to own property would be denied." [9]

That apparently is a common view. It overlooks several things. First, the right to own or lease property is already denied to many solely because of the pigment of their skin; they are, indeed, under the control of a few who determine where and how the colored people shall live and what the nature of our cities will be. Second, the agencies that are zoning the cities along racial lines are state licensees.

Zoning is a state and municipal function. See *Euclid* v. *Ambler Co.,* 272 U. S. 365, 389 *et seq.; Berman* v. *Parker,* 348 U. S. 26, 34–35. When the State leaves that function to private agencies or institutions which are licensees and which practice racial discrimination and zone our cities into white and black belts or white and black ghettoes, it suffers a governmental function to be performed under private auspices in a way the State itself may not act. The present case is therefore kin to *Terry* v. *Adams,* 345 U. S. 461, 466, where a State allowed a private group (known as the Jaybird Association, which was the dominant political group in county elections) to perform an electoral function in derogation of the rights of Negroes under the Fifteenth Amendment.

Leaving the zoning function to groups which practice racial discrimination and are licensed by the States

---

[8] Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 2d Sess., ser. 16, 1639 (1966).

[9] *Ibid.*

constitutes state action in the narrowest sense in which *Shelley* v. *Kraemer, supra,* can be construed. For as noted by Mr. Justice Black in *Bell* v. *Maryland,* 378 U. S. 226, 329 (dissenting), restrictive covenants "constituted a restraint on alienation of property, sometimes in perpetuity, which, if valid, was in reality the equivalent of and had the effect of state and municipal zoning laws, accomplishing the same kind of racial discrimination as if the State had passed a statute instead of leaving this objective to be accomplished by a system of private contracts, enforced by the State."

Under California law no person may "engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this State without first obtaining a real estate license." Calif. Bus. & Prof. Code § 10130. These licensees are designated to serve the public. Their licenses are not restricted, and could not be restricted, to effectuate a policy of segregation. That would be state action that is barred by the Fourteenth Amendment. There is no difference, as I see it, between a State authorizing a licensee to practice racial discrimination and a State, without any express authorization of that kind nevertheless launching and countenancing the operation of a licensing system in an environment where the whole weight of the system is on the side of discrimination. In the latter situation the State is impliedly sanctioning what it may not do specifically.

If we were in a domain exclusively private, we would have different problems. But urban housing is in the public domain as evidenced not only by the zoning problems presented but by the vast schemes of public financing with which the States and the Nation have been extensively involved in recent years. Urban housing is clearly marked with the public interest. Urban housing,

like restaurants, inns, and carriers (*Bell* v. *Maryland,* 378 U. S. 226, 253–255, separate opinion), or like telephone companies, drugstores, or hospitals, is affected with a public interest in the historic and classical sense. See *Lombard* v. *Louisiana,* 373 U. S. 267, 275–278 (concurring opinion).

I repeat what was stated by Holt, C. J., in *Lane* v. *Cotton,* 12 Mod. 472, 484 (1701):

> "[W]herever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him . . . . If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which is for the public good, and has thereby exposed and vested an interest of himself in all the King's subjects that will employ him in the way of his trade. If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier."

Since the real estate brokerage business is one that can be and is state-regulated and since it is state-licensed, it must be dedicated, like the telephone companies and the carriers and the hotels and motels, to the requirements of service to all without discrimination—a standard that in its modern setting is conditioned by the demands of the Equal Protection Clause of the Fourteenth Amendment.

And to those who say that Proposition 14 represents the will of the people of California, one can only reply:

"Wherever the real power in a Government lies, there is the danger of oppression. In our Governments the real power lies in the majority of the Community, and the invasion of private rights is *chiefly* to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the Constituents. This is a truth of great importance, but not yet sufficiently attended to . . . ." 5 Writings of James Madison 272 (Hunt ed. 1904).

MR. JUSTICE HARLAN, whom MR. JUSTICE BLACK, MR. JUSTICE CLARK, and MR. JUSTICE STEWART join, dissenting.

I consider that this decision, which cuts deeply into state political processes, is supported neither by anything "found" by the Supreme Court of California nor by any of our past cases decided under the Fourteenth Amendment. In my view today's holding, salutary as its result may appear at first blush, may in the long run actually serve to handicap progress in the extremely difficult field of racial concerns. I must respectfully dissent.

The facts of this case are simple and undisputed. The legislature of the State of California has in the last decade enacted a number of statutes restricting the right of private landowners to discriminate on the basis of such factors as race in the sale or rental of property. These laws aroused considerable opposition, causing certain groups to organize themselves and to take advantage of procedures embodied in the California Constitution permitting a "proposition" to be presented to the voters for a constitutional amendment. "Proposition 14" was

thus put before the electorate in the 1964 election and was adopted by a vote of 4,526,460 to 2,395,747. The Amendment, Art. I, § 26, of the State Constitution, reads in relevant part as follows:

"Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses." [1]

I am wholly at a loss to understand how this straightforward effectuation of a change in the California Constitution can be deemed a violation of the Fourteenth Amendment, thus rendering § 26 void and petitioners' refusal to rent their properties to respondents, because of their race, illegal under prior state law. The Equal Protection Clause of the Fourteenth Amendment, which forbids a State to use its authority to foster discrimination based on such factors as race, *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410; *Brown* v. *Board of Education,* 347 U. S. 483; *Goss* v. *Board of Education,* 373 U. S. 683, does not undertake to control purely personal prejudices and predilections, and individuals acting on their own are left free to discriminate on racial grounds if they are so minded, *Civil Rights Cases,* 109 U. S. 3. By the same token, the Fourteenth Amendment does not require of States the passage of laws preventing such private discrimination, although it does not of course disable them from enacting such legislation if they wish.

---

[1] "Real Property" is defined by § 26 as "any interest in real property of any kind or quality, present or future, irrespective of how obtained or financed, which is used, designed, constructed, zoned or otherwise devoted to or limited for residential purposes whether as a single family dwelling or as a dwelling for two or more persons or families living together or independently of each other."

In the case at hand California, acting through the initiative and referendum, has decided to remain "neutral" in the realm of private discrimination affecting the sale or rental of private residential property; in such transactions private owners are now free to act in a discriminatory manner previously forbidden to them. In short, all that has happened is that California has effected a *pro tanto* repeal of its prior statutes forbidding private discrimination. This runs no more afoul of the Fourteenth Amendment than would have California's failure to pass any such antidiscrimination statutes in the first instance. The fact that such repeal was also accompanied by a constitutional prohibition against future enactment of such laws by the California Legislature cannot well be thought to affect, from a federal constitutional standpoint, the validity of what California has done. The Fourteenth Amendment does not reach such state constitutional action any more than it does a simple legislative repeal of legislation forbidding private discrimination.

I do not think the Court's opinion really denies any of these fundamental constitutional propositions. Rather it attempts to escape them by resorting to arguments which appear to me to be entirely ill-founded.

## I.

The Court attempts to fit § 26 within the coverage of the Equal Protection Clause by characterizing it as in effect an affirmative call to residents of California to discriminate. The main difficulty with this viewpoint is that it depends upon a characterization of § 26 that cannot fairly be made. The provision is neutral on its face, and it is only by in effect asserting that this requirement of passive official neutrality is camouflage that the Court is able to reach its conclusion. In depicting the

provision as tantamount to active state encouragement of discrimination the Court essentially relies on the fact that the California Supreme Court so concluded. It is said that the findings of the highest court of California as to the meaning and impact of the enactment are entitled to great weight. I agree of course, that *findings of fact* by a state court should be given great weight, but this familiar proposition hardly aids the Court's holding in this case.

There is no disagreement whatever but that § 26 was meant to nullify California's fair-housing legislation and thus to remove from private residential property transactions the state-created impediment upon freedom of choice. There were no disputed issues of fact at all, and indeed the California Supreme Court noted at the outset of its opinion that "[i]n the trial court proceedings allegations of the complaint were not factually challenged, no evidence was introduced, and the only matter placed in issue was the legal sufficiency of the allegations." 64 Cal. 2d 529, 531–532, 413 P. 2d 825, 827. There was no finding, for example, that the defendants' actions were anything but the product of their own private choice. Indeed, since the alleged racial discrimination that forms the basis for the *Reitman* refusal to rent on racial grounds occurred in 1963, it is not possible to contend that § 26 in any way influenced this particular act. There were no findings as to the general effect of § 26. The Court declares that the California court "held the intent of § 26 was to authorize private racial discriminations in the housing market . . . ," *ante,* p. 376, but there is no supporting fact in the record for this characterization. Moreover, the grounds which prompt legislators or state voters to repeal a law do not determine its constitutional validity. That question is decided by what the law does, not by what those who

voted for it wanted it to do, and it must not be forgotten that the Fourteenth Amendment does not compel a State to put or keep any particular law about race on its books. The Amendment only forbids a State to pass or keep in effect laws discriminating on account of race. California has not done this.

A state enactment, particularly one that is simply permissive of private decision-making rather than coercive and one that has been adopted in this most democratic of processes, should not be struck down by the judiciary under the Equal Protection Clause without persuasive evidence of an invidious purpose or effect. The only "factual" matter relied on by the majority of the California Supreme Court was the context in which Proposition 14 was adopted, namely, that several strong antidiscrimination acts had been passed by the legislature and opposed by many of those who successfully led the movement for adoption of Proposition 14 by popular referendum. These circumstances, and these alone, the California court held, made § 26 unlawful under this Court's cases interpreting the Equal Protection Clause. This, of course, is nothing but a legal conclusion as to federal constitutional law, the California Supreme Court not having relied in any way upon the State Constitution. Accepting all the suppositions under which the state court acted, I cannot see that its conclusion is entitled to any special weight in the discharge of our own responsibilities. Put in another way, I cannot transform the California court's conclusion of law into a finding of fact that the State through the adoption of § 26 is actively promoting racial discrimination. It seems to me manifest that the state court decision rested entirely on what that court conceived to be the compulsion of the Fourteenth Amendment, not on any fact-finding by the state courts.

## II.

There is no question that the adoption of § 26, repealing the former state antidiscrimination laws and prohibiting the enactment of such state laws in the future, constituted "state action" within the meaning of the Fourteenth Amendment. The only issue is whether this provision impermissibly deprives any person of equal protection of the laws. As a starting point, it is clear that any statute requiring unjustified discriminatory treatment is unconstitutional. *E. g., Nixon* v. *Herndon,* 273 U. S. 536; *Brown* v. *Board of Education, supra; Peterson* v. *City of Greenville,* 373 U. S. 244. And it is no less clear that the Equal Protection Clause bars as well discriminatory governmental administration of a statute fair on its face. *E. g., Yick Wo* v. *Hopkins,* 118 U. S. 356. This case fits within neither of these two categories: Section 26 is by its terms inoffensive, and its provisions require no affirmative governmental enforcement of any sort. A third category of equal-protection cases, concededly more difficult to characterize, stands for the proposition that when governmental involvement in private discrimination reaches a level at which the State can be held responsible for the specific act of private discrimination, the strictures of the Fourteenth Amendment come into play. In dealing with this class of cases, the inquiry has been framed as whether the State has become "a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 725.

Given these latter contours of the equal-protection doctrine, the assessment of particular cases is often troublesome, as the Court itself acknowledges. *Ante,* pp. 378–379.

However, the present case does not seem to me even to approach those peripheral situations in which the question of state involvement gives rise to difficulties. See, e. g., Evans v. Newton, 382 U. S. 296; Lombard v. Louisiana, 373 U. S. 267. The core of the Court's opinion is that § 26 is offensive to the Fourteenth Amendment because it effectively *encourages* private discrimination. By focusing on "encouragement" the Court, I fear, is forging a slippery and unfortunate criterion by which to measure the constitutionality of a statute simply permissive in purpose and effect, and inoffensive on its face.

It is true that standards in this area have not been definitely formulated, and that acts of discrimination have been included within the compass of the Equal Protection Clause not merely when they were compelled by a state statute or other governmental pressures, but also when they were said to be "induced" or "authorized" by the State. Most of these cases, however, can be approached in terms of the impact and extent of affirmative state governmental activities, e. g., the action of a sheriff, *Lombard* v. *Louisiana, supra;* the official supervision over a park, *Evans* v. *Newton, supra;* a joint venture with a lessee in a municipally owned building, *Burton* v. *Wilmington Parking Authority, supra.*[2] In

---

[2] In *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.*, 235 U. S. 151, cited by the Court, the complaint of the Negro appellants was held to have been properly dismissed on the ground that its allegations were "altogether too vague and indefinite," *id.*, at 163. In dictum the Court stated that where a State regulated the facilities of a common carrier it could not constitutionally enact a statute that did not comply with the "separate but equal" doctrine. Whatever the implications of the Fourteenth Amendment may be as to common carriers, compare the opinions of Goldberg, J., concurring, and BLACK, J., dissenting, in *Bell* v. *Maryland*, 378 U. S. 226, 286,

situations such as these the focus has been on positive state cooperation or partnership in affirmatively promoted activities, an involvement that could have been avoided. Here, in contrast, we have only the straightforward adoption of a neutral provision restoring to the sphere of free choice, left untouched by the Fourteenth Amendment, private behavior within a limited area of the racial problem. The denial of equal protection emerges only from the conclusion reached by the Court that the implementation of a new policy of governmental neutrality, embodied in a constitutional provision and . replacing a former policy of antidiscrimination, has the effect of lending encouragement to those who wish to discriminate. In the context of the actual facts of the case, this conclusion appears to me to state only a truism: people who want to discriminate but were previously forbidden to do so by state law are now left free because the State has chosen to have no law on the subject at all. Obviously whenever there is a change in the law it will have resulted from the concerted activity of those who desire the change, and its enactment will allow those supporting the legislation to pursue their private goals.

A moment of thought will reveal the far-reaching possibilities of the Court's new doctrine, which I am sure the Court does not intend. Every act of private discrimination is either forbidden by state law or permitted by it. There can be little doubt that such permissiveness—whether by express constitutional or statutory provision, or implicit in the common law—to some extent "encourages" those who wish to discriminate to do so. Under this theory "state action" in the form of laws

318, nothing in *McCabe* would appear to have much relevance to the problem before us today.

Neither is there force in the Court's reliance on *Nixon* v. *Condon*, 286 U. S. 73, a voting case decided under the Fifteenth as well as the Fourteenth Amendment.

that do nothing more than passively permit private discrimination could be said to tinge *all* private discrimination with the taint of unconstitutional state encouragement.

This type of alleged state involvement, simply evincing a refusal to involve itself at all, is of course very different from that illustrated in such cases as *Lombard, Peterson, Evans,* and *Burton, supra,* where the Court found active involvement of state agencies and officials in specific acts of discrimination. It is also .quite different from cases in which a state enactment could be said to have the obvious purpose of fostering discrimination. *Anderson* v. *Martin,* 375 U. S. 399. I believe the state action required to bring the Fourteenth Amendment into operation must be affirmative and purposeful, actively fostering discrimination. Only in such a case is ostensibly "private" action more properly labeled "official." I do not believe that the mere enactment of § 26, on the showing made here, falls within this class of cases.

## III.

I think that this decision is not only constitutionally unsound, but in its practical potentialities short-sighted. Opponents of state antidiscrimination statutes are now in a position to argue that such legislation should be defeated because, if enacted, it may be unrepealable. More fundamentally, the doctrine underlying this decision may hamper, if not preclude, attempts to deal with the delicate and troublesome problems of race relations through the legislative process. The lines that have been and must be drawn in this area, fraught as it is with human sensibilities and frailties of whatever race or creed, are difficult ones. The drawing of them requires understanding, patience, and compromise, and is best done by legislatures rather than by courts. When

legislation in this field is unsuccessful there should be wide opportunities for legislative amendment, as well as for change through such processes as the popular initiative and referendum. This decision, I fear, may inhibit such flexibility. Here the electorate itself overwhelmingly wished to overrule and check its own legislature on a matter left open by the Federal Constitution. By refusing to accept the decision of the people of California, and by contriving a new and ill-defined constitutional concept to allow federal judicial interference, I think the Court has taken to itself powers and responsibilities left elsewhere by the Constitution.

I believe the Supreme Court of California misapplied the Fourteenth Amendment, and would reverse its judgments, and remand the case for further appropriate proceedings.