Maradean BARCUME, et al., Plaintiffs,

v.

The CITY OF FLINT, et al., Defendants.

No. 84–8066.

United States District Court, E.D. Michigan, S.D.

July 15, 1986.

Susan Winshall, Southfield, Mich., for plaintiffs.

Thomas H. Schwarze, Detroit, Mich., Bernard Feldman, Birmingham, Mich., Robert H. Martin, Detroit, Mich., S. Olof Karlstrom, City Atty., Flint, Mich., for defendants.

## MEMORANDUM OPINION
## AND ORDER

NEWBLATT, District Judge.

Before the Court is plaintiffs' supplemental brief in support of their motion for

summary judgment. On April 10, 1986, this Court ordered plaintiffs to file a supplemental brief and indicate what evidence in the record could establish purposeful discrimination. The Court reserved the issue regarding the constitutionality of the Affirmative Action Plan (AAP). Plaintiffs have filed their supplemental brief, and the Court will now rule on the constitutionality of that Plan.

As mentioned in the earlier opinion, the issue is whether Flint's decision not to include women *per se* in the AAP was a violation of the Equal Protection Clause of the Fourteenth Amendment. This question can be answered by the use of a two-part test. The first prong requires the Court to decide whether Flint intended to discriminate against women. In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court ruled that state action would not be held unconstitutional simply because it results in a racially disproportionate impact.[1] "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The Supreme Court has held that the principles enunciated in *Davis* and *Arlington Heights* apply with equal force to cases, such as this, involving alleged gender discrimination. *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct invidence of intent as may be available. The impact of the official action ... may provide an important starting point." *Arlington Heights, supra* 429 U.S. at 266, 97 S.Ct. at 564. In *Feeney, supra,* the Court held that:

'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences ... It implies that the decision maker, ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. (Underlining supplied.)

*Id.* 442 U.S. at 279, 99 S.Ct. at 2296.[2]

Proof of discriminatory intent must usually depend on objective evidence of what happened rather than evidence describing the subjective state of mind of the actor. In *Arlington Heights, supra,* the Court identified subjects of "proper inquiry" to determine whether racially discriminatory intent existed. First, a clear pattern unexplainable on grounds other than race or sex can emerge from the effect of state action.[3] Next, the historical background of the decision or the "sequence of events leading up to challenged decision also may shed some light on the decisionmaker's purpose." *Id.* 429 U.S. at

---

**1.** "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id* 426 U.S. at 242, 96 S.Ct. at 2049.

**2.** In *Feeney,* the Court found that nothing in the record demonstrated that the veterans' preference was devised or reenacted "because it would accomplish the collateral goal of keeping women in a stereotypic and pre-defined place ..." *Id.* So, the Court concluded that the state's action was not taken because of its adverse effects on women.

The Court did mention in a footnote that its rule mentioned above did not mean that "inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifi-

able group are inevitable as the gender-based consequences, ch. 31, § 23, a strong inference that the adverse effects were desired can reasonably be drawn." *Id.* at n. 25. However, the Court stated that this was not a synonym for proof. This suggests that to demonstrate discriminatory purpose it would be sufficient to show that the framing of a disputed policy was premised on archaic and outmoded notions about women. (*See e.g.,* Note, *Discriminatory purpose and Disproportionate Impact: an assessment after Feeney,* 79 Colum.L.Rev. 1376 (1979).

**3.** *See, e.g., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). This is a very narrow exception to the rule that discriminatory purpose must be shown. *Arlington Heights, supra.*

267, 97 S.Ct. at 564.[4] Moreover, departures from the normal procedural sequence as well as substantive departures (especially if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached) may be relevant. Finally, "legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings or reports." *Id.*

With this in mind, the Court cannot say that there is proof of discriminatory intent here. Plaintiffs have not presented evidence that Flint selected a particular course of conduct, excluding women *per se* from the AAP, because of its adverse effects on women.[5] Although there is obviously a great deal of evidence before the Court which establishes that Flint was aware that women, along with blacks, had been the subject of historical and contemporary discrimination,[6] nothing indicates that the decision not to include women from the AAP was intended to harm women nor is there any indication that the omission was premised on an archaic and outmoded notion about women, such as that women are unfit to serve as police sergeants.

Obviously, Flint's decision to limit the AAP as it did was an intentional act.[7] Moreover, the possible negative effects of excluding women were brought to the attention of the City, the City council and the HRC. Plaintiffs in this case clearly made their objections to the Plan known prior to the implementation of the Plan. However, as the Supreme Court indicated in *Feeney* " '[d]iscriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences." *Id* 442 U.S. at 279, 99 S.Ct. at 2296. The City, however, chose not to include women in the AAP. The HRC[8] concluded that "a 1-to-1 implementation ratio based on race would tend to *de facto* promote females to Sergeant." Moreover, the HRC stated that if the AAP could not remedy imbalances in the promotion system with regards to women, then further adjustments should be made.

In response to this Court's order, plaintiffs filed an extensive list of evidence in support of their claim of purposeful discrimination. Plaintiffs catagorize this evidence by the factors discussed in *Arlington Heights, supra.* The majority of this evidence is not disputed. It is only the legal conclusions that can be drawn from the facts which are in dispute. First, plaintiffs offer general evidence that women were excluded from the AAP because of the adverse impact on women. For example, they contend that women *per se* were not included because their inclusion would dilute black and white male promotions, that women would fare better by fair promotions if the race neutral system was left intact and that exclusion was a continuing manifestation of inherent sex bias against women. Moreover, plaintiffs argue that women were excluded in spite of evidence that women had been discriminated against

---

4.  *See, e.g., Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

5.  In this case, plaintiffs point out that if women *per se* had been included in the plan for favorable treatment, there would have been several extra white women promoted to Sergeant. Plaintiffs' Brief at 20–21. Defendants dispute plaintiffs' claims that there has been any adverse impact on women because under the AAP several black women have been promoted to Police Sergeant—more than would have been promoted without the Plan. Defendants' Brief at 81–82.

6.  In fact, as indicated in the facts stated in the earlier opinion, the City proceeded very carefully in implementing the Plan. This effort culminated in the findings of the Human Resource Commission's report which supported the negotiated AAP.

7.  It would be, as the Court in *Feeney* said, "disingenuous to say that the adverse consequences of this legislation for women were unintended, in the sense that they were not volitional or in the sense that they were not foreseeable." *Id.* 442 U.S. at 278, 99 S.Ct. at 2296.

8.  The HRC by authority of Article V, Section 2–20 of the Flint City Code, conducted hearings on the need for affirmative action in the City's Police and Fire Departments.

and that exclusion of women from the Plan would have an adverse impact on women. This is simply not evidence that women were excluded because they were women but rather it is evidence that they were excluded in spite of their sex.[9] Moreover, mere awareness of an adverse impact is not sufficient, in itself, for purposeful discrimination. Although there has been, and according to the HRC, continues to be discrimination against women in the FPD, the history of discrimination against women in the FPD is not the issue.

■ Next, plaintiffs claim that the historical background of the decision not to include women *per se* reveals a discriminatory intent. However, plaintiffs cite only evidence of historical discrimination in the FPD and nothing to show that this decision was unconstitutional. This is clearly distinguishable from the type of situation mentioned in *Arlington Heights*.[10] Third, in order to show purposeful discrimination, plaintiffs cite evidence of a specific sequence of events leading up to the challenged decision. Specifically, plaintiffs state that Flint announced its objective of remedying underutilization of minorities but the end result was an exclusion of women *per se*. This is unlike the situation cited in *Arlington Heights*.[11] In this case, the evidence suggests that Flint made a decision that it would remedy the effects of racial discrimination in promotions before it dealt with the results of sex discrimination. This was a decision it was entitled to make. Moreover, Flint did not preclude the possibility of changing the AAP if it did not remedy the imbalances.

Fourth, plaintiffs contend that certain procedural and substantive departures from normal procedures demonstrate an improper purpose. Unfortunately, plaintiffs give no indication as to what the normal procedures are or what they should be when formulating a voluntary AAP. The evidence which plaintiffs cite does not indicate there were departures from normal procedures from which the Court could infer an improper purpose, but rather that Flint chose to take one course of action over another.[12]

■ Finally, plaintiffs cite numerous "contemporary statements," both in favor of the inclusion of women *per se* in the AAP and against including women, as evidence of discriminatory intent. The statements which plaintiffs contend favor including women merely report the fact that women have been the subject of historic discrimination in the FPD. Again, this is not the issue. Moreover, the evidence of what Flint was really "up to" merely indicates that Flint wanted to deal with remedying discrimination against blacks in promotions before dealing with women.[13] Al-

9. The impact on women in this case is clearly in dispute as defendants contend that women have benefited from the AAP.

10. For example, in *Griffin v. School Bd. of Prince Edward,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1974), the Supreme Court held that the Prince Edward public schools were closed and private schools were opened in their place with state and county assistance for one reason—to ensure that black and white children would not, under any circumstances, attend the same school. The record indicated that such legislative efforts were in direct response to efforts to desegregate Prince Edward public schools.

11. *See, e.g., Reitman v. Mulkey,* 387 U.S. 369, 373–76, 87 S.Ct. 1627, 1629–32, 18 L.Ed.2d 830 (1967). In *Reitman,* the Supreme Court held that a state constitutional provision which was enacted in response to and nullified the state's fair housing laws and established "a purported constitutional right to *privately* discriminate," was unconstitutional.

12. For example, plaintiffs state that although the HRC concluded that women were adversely impacted by present FPD policies and practice and that the AAP was "flawed" by its exclusion of women *per se,* the City implemented the AAP for minorities only. This is simply not a departure from normal procedure but reflects a choice of the City in how it was going to attack the problem of discrimination in the FPD. Moreover, whether the HRC concluded that the AAP was flawed is certainly not clear from its final report.

13. For example, plaintiffs indicate that Councilman Brown stated that "[w]e all admit that there has been discrimination against females, and we are going to go back and take care of that problem after we get through this process." (McManaman Dep. at 43)

though there appears to have been concern that the inclusion of women would dilute black promotions,[14] this does not suggest that Flint intended to harm women or based its decision on improper considerations.[15]

Thus, the Court cannot say that Flint excluded women *per se because* of the adverse impact this decision would have on women. At the most, the City excluded women *in spite* of the adverse impact. Nor can the Court say that the decision was based on a belief that women were less deserving or less capable of doing the job. Although some of the evidence in this case may indicate an indifference to the fate of women on the part of some city officials, this Court is of the opinion that the City decided to attack one problem at a time.

Although the standard which this Court is required to adopt—that the decision must be made because of its adverse impact on women—may seem to be rather difficult to meet, there are several reasons for the purposeful discrimination test.[16]

First, it is generally established that state and local legislative bodies are not required to remedy every evil with equal vigor or at the same time. *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).[17] Flint was not constitutionally obligated to deal with every problem concurrently and with equal vigor nor was it obligated to remedy every aspect of the problem. Clearly, Flint had the right to balance the constraints of limited resources against the evils which needed to be corrected.[18] *See Dandrige v. Williams,* 397 U.S. 471, 487–88, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970) (Equal protection of the law "does not require that a [government] must choose between attacking every aspect of a problem or not attacking the problem at all").[19] *See also Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

Second, although Flint was aware that women had been historically discriminated against in the FPD (as had blacks) and that choosing to exclude women from

**14.** Do plaintiffs really mean to suggest that Flint go forward with an ineffective Plan?

**15.** Plaintiffs also contend that as further evidence of purposeful discrimination is the fact that plaintiff Barbara Burnett, who was to be the first white woman promoted since the implementation of the AAP, was passed over because of pending drug charges. Plaintiffs fail to indicate nor does this Court see how this relates to the decision to exclude women from the AAP.

**16.** Although the literal language in *Feeney, supra* would seem to indicate that the purpose must be to harm women, this Court has taken the position that discriminatory purpose must mean something less than an intention to harm women. As one commentator has suggested:
The gender cases suggest that to demonstrate discriminatory purpose it would be sufficient to show that the framing of a disputed policy was premised on archaic and outmoded notions about women; for example, that it is not important to women to find employment, or that it is not essential for women to go to college. Even proof of indifference to the fate of women might be considered relevant if it reflects stereotypic thinking about 'women's place.'
Note, *supra* note 2, at 1398

**17.** A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private and that account for limitations on the practical ability of the state to remedy every ill.
*Id.* 457 U.S. at 216, 102 S.Ct. at 2394.

**18.** This is not to say that Flint made a wise decision in failing to include women *per se* in the AAP. The facts indicate that Flint was presented with an opportunity to remedy discrimination in promotions at the FPD against blacks and women but chose to include only blacks in the plan apparently reserving the issue of a plan for women for later if the Plan adopted did not *de facto* remedy discrimination against women. Although Flint may have bungled an opportunity to include women and to avoid this litigation (since defendants had notice of the objections), the Fourteenth Amendment is not a refuge from ill-advised laws. *Feeney, supra* at 281, 99 S.Ct. at 2297, (*quoting District of Columbia v. Brooke,* 214 U.S. 138, 29 S.Ct. 560, 53 L.Ed. 941 (1908) ). As long as the decision was free from invidious discrimination, it cannot violate the equal protection clause.

**19.** *See also Curry v. Dempsey,* 701 F.2d 580 (6th Cir.1983).

the AAP could have a discriminatory impact,[20] this alone cannot imply discriminatory intent. In *Feeney, supra,* as already stated, the Court required more than "intent as volition or intent as awareness of consequences." To consider the AAP in any other light would do disservice to the concept that unless government actions violate a specific constitutional protection, the political process exists, at least in part, to ensure that the interests of diverse groups are adequately weighed in legislative balancing. If it were otherwise, the mere awareness of adverse results would impair the legislative body's power to make decisions. This would essentially prevent any governmental decision making that did not take into account every member of a group which voiced its objections to not being included in the plan.[21]

Finally, to allow a challenge to the AAP without proof of discriminatory purpose would require the Court to engage in the social and political analysis necessary to decide which group is entitled to participate in the AAP. This would essentially require the Court to engage in social engineering—a task which does not lie within the judicial competence. *See University of California Regents v. Bakke,* 438 U.S. 265, 297 and n. 37, 98 S.Ct. 2733, 2751 and n. 37, 57 L.Ed.2d 750 (1978). This task lies more properly with legislative bodies who are "expected to take action that may benefit one group at the expense of another ..." *Note, supra* note 2, at 1383.[22]

Thus, because the Court concludes that plaintiffs have failed to show that there was purposeful discrimination, the only remaining inquiry is whether it was rational for Flint to conclude that the racial remedy should be dealt with before the sexual discrimination remedy.[23] *Id.* at 359 n. 35, 98 S.Ct. at 2783 n. 35 (*citing San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 38–39, 93 S.Ct. 1278, 1299–1300, 36 L.Ed.2d 16 (1973). Under this standard, Flint need only show that the AAP has some rational relationship to a legitimate state interest. In other words, the AAP cannot be so irrational as to be invidiously discriminatory. Keeping in mind the above-mentioned principles that " 'statute is not invalid under the Constitution because it might have gone farther than it did,' ... but a legislature need not 'strike at all evils at the same time,' ... and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind ...,' " *Rodriguez, supra* at 39, 93 S.Ct. at 1300 (*quoting Katzenbach, supra* 384 U.S. at 656–57, 86 S.Ct. at 1726–27), the Court holds that the AAP bears a rational relationship to a legitimate state purpose. Both parties readily agree, and it could not be seriously disputed, that eliminating the effects of discrimination in the FPD is a legitimate state purpose. Moreover, the present AAP bears a rational relationship to this purpose as is clear from the above and is not the result of

---

20. The Court assumes for purposes of this opinion that such an impact has resulted. There is debate, however, as to whether this is the case since black women apparently have benefited under the plan.

21. Were the existence of a disproportionate impact alone sufficient to confer on the courts the task of weighing the importance of governmental interests (and the efficacy of particular classifications in furthering those interests), legislatures and other goverrmental bodies would be unable to act conclusively whenever it was foreseeable, or even conceivable, that a choice might have a greater-than-average adverse effect on a "protected" group. *Note, supra* note 2, at 1384.

22. The function of the equal protection clause is merely to measure the constitutional validity of these classifications. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 59–60, 93 S.Ct. 1278, 1310–11, 36 L.Ed.2d 16 (1973) ("the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary and capricious.")

23. If the Court had concluded that Flint had engaged in invidious discrimination in denying *women per se* participation in the AAP, the test formulated in *Bratton v. City of Detroit,* 704 F.2d 878, *modified,* 712 F.2d 222 (6th Cir.1983), *cert denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984) would then be appropriate.

hurried, ill-conceived legislation. On the contrary, it is the culmination of considered efforts by Flint and many other parties to remedy the problem of racial discrimination in promotions. Although there was concern about the exclusion of women *per se* from the Plan, the HRC concluded that women,[24] insofar as they were within the racial classification, would benefit somewhat *de facto* from the present Plan and there is, in fact, evidence that that has happened. There is simply no evidence in the record that would establish any impropriety in adopting the race remedy first and plaintiffs have asserted none. Moreover, nothing in the Plan precludes Flint from amending the Plan or enacting a new Plan which includes women *per se.*

Therefore, for the reasons just stated, defendants' Motion for summary judgment as to the constitutionality of the affirmative action program is GRANTED and plaintiffs' Motion as to that same issue is DENIED. There is no evidence as to purposeful discrimination that would raise an issue of material fact.

IT IS SO ORDERED.

---

**24.** Thus, possible benefit to black women resulting from the AAP could not, of course, justify purposeful discrimination against women or white women. Nevertheless, it might make one feel better in deferring to a later time dealing with gender discrimination while adopting an AAP to deal with race.