UNITED STATES of America,
Plaintiff,

v.

Mrs. Ernest J. CANTRELL d/b/a Cantrell's Bar, individually and as representative of a class of persons similarly situated, Defendants.

Civ. A. No. 69–102.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 2, 1969.

John Mitchell, Atty. Gen.,* Jerris Leonard, Asst. Atty. Gen.,* Robert T.

* The suit was instituted under Ramsey Clark, Atty. Gen., and Stephen J. Pollak, Asst. Atty. Gen. for Civil Rights. Their successors in office have been substituted as attorneys of record.

Moore, Washington, D. C., Pat Hardin, Asst. U. S. Atty., New Orleans, La., for plaintiff.

Sidney W. Provensal, Jr., New Orleans, La., for defendants.

RUBIN, District Judge.

The Attorney General of the United States brought this suit under the Fourteenth Amendment and the Civil Rights Act of 1964, to enjoin Mrs. Ernest J. Cantrell, the owner of a bar in Myrtle Grove, Plaquemines Parish, Louisiana, from continuing to obey Parish ordinances requiring racial segregation and discrimination against servicemen in uniform, and to have those ordinances declared unconstitutional. Mrs. Cantrell was sued individually and as representative of a class consisting of persons operating bars and cocktail lounges in Plaquemines Parish pursuant to beer and liquor permits issued by the Plaquemines Parish Commission Council.

The court having found that this action satisfies the prerequisites for a class suit set out in Rule 23(a), Fed.R.Civ.Proc., and is maintainable as such under subsection (b) (1) (B) of Rule 23,[1] notice of the suit was sent to each member of the defendant class. As there are no contested issues of material fact, the matter is before the court on cross-motions by the plaintiff and the defendant for summary judgment. Defendant also moves to dismiss the complaint for mootness.

## I. THE SUIT IS NOT MOOT

When the suit was initially filed, the government charged that defendants' refusal to operate on an integrated basis violated Section 202 of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000a–1, because they were discriminating racially in compliance with several Parish ordinances calling for such behavior.[2] One ordinance specifically requiring segregation by race may have been repealed earlier, but the licensing procedure of the Plaquemines Parish Commission Council, through June, 1969, preserved racial discrimination by providing for racial designations on applications and on the permits themselves, which are displayed in the establishments.[3] Almost six months after this suit was instituted, the Commission Council enacted a supervening general licensing ordinance, which is racially neutral; at the same

1. Subsection (b) (2) of revised Rule 23 was intended to provide the primary vehicle for injunctive class actions, particularly civil rights suits. See 3B Moore, Federal Practice (2d ed. 1969) ¶ 23.40. In the instant case, however, the United States sues as an individual, although in the interest of a particular class. For procedural purposes, the relevant group is the defendant class of persons operating bars and cocktail lounges in Plaquemines Parish. This suit is one in which "adjudications with respect to individual members of the class * * * would as a practical matter be dispositive of the interests of the other members," Rule 23(b) (1) (B). The consequences of classification under (b) (1) and (b) (2) are the same.

2. Ordinance of August 23, 1945; Ordinance No. 9, December 27, 1961; Ordinance No. 31, August 29, 1963.

3. On its face, Ordinance No. 9 did not explicitly require racial segregation. However, an applicant for a permit to sell alcoholic beverages was asked on the

application form whether he intended to serve a white or Negro clientele. Section 19 of the Ordinance included in the list of "Acts Prohibited on Licensed Premises" the furnishing of alcoholic beverages "to any person not included in the permit authorization." Violation of that provision was punishable under Section 38, which declared any breach of the Ordinance to be a misdemeanor with a penalty of up to $50 fine and 30 days in jail, the penalties to be increased for subsequent violations. In addition, selling to persons not included in the authorization was ground for suspension or revocation of the permit, as was withholding or misstating facts requested on the application form. Thus the Ordinance gave the force of law to the racial designations demanded by the permit application form.

Moreover, the permits themselves contained the notation "White Trade Only," "Negro Trade Only," or "White and Negro, Separately." These permits are prominently displayed in the establishments.

time revision of the applications and licensing procedures was begun.[4]

Defendants contend that these changes have rendered the government's claims moot. It is true that the government can no longer complain of or rely on the offending ordinances that have been repealed. Tyson v. Cazes, 5 Cir. 1966, 363 F.2d 742.[5] However, Ordinance No. 31 denying servicemen in uniform admission to bars and cocktail lounges in Plaquemines Parish is still in force, and operators of bars and cocktail lounges in that Parish continue to discriminate racially.

The government's original claim for relief was as much based upon Ordinance No. 31 as on the other ordinances requiring segregation more directly. It is well established that, even though some issues and claims become moot through changes in circumstances, the court must decide any remaining disputed issues properly in the case. United Public Workers v. Mitchell, 1946, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. This is particularly important in the civil rights context, where forces opposed to racial equality have proved persistent and ingenious in devising means to evade or postpone compliance with the constitutional mandate.[6]

## II. ORDINANCE NO. 31—ITS BACKGROUND

On August 29, 1963, the Plaquemines Parish Commission Council adopted Ordinance No. 31, prohibiting all persons operating bars and cocktail lounges under permits from the Council from admitting to their place of business "any military personnel in the uniform of any of the military services, and from selling, giving or serving any beer, liquor, beverage or incidentals to any such uniformed person." Violation of the ordinance is a misdemeanor, punishable by a $25 fine and/or 30 days in prison.

The Commission Council's motivation in passing the ordinance is revealed in its preamble; this notes the Council's duty "to preserve the peace and good order of the people of this Parish," interests found to be threatened because

"a situation has been created by the Gesell Report implemented by the Yarmolinsky-McNamara Defense Department Directive which threatens peaceful relations between our civilian population and the personnel of the U. S. Navy Joint Air Training Station at Belle Chasse, and further threatens to interfere with the orderly operation of our local government and the rights of our citizens under penalty of economic boycott and other offensive reprisals * * *"

The document referred to as the Gesell Report was prepared by The President's Committee on Equal Opportunity in the Armed Forces, appointed by President Kennedy in June, 1962. Gerhard A. Gesell, now a United States District Judge, was chairman of the committee; its other members were Nathaniel S. Colley, Abe Fortas, Louis J. Hector, Benjamin Muse, John H. Sengstache, and Whitney M. Young, Jr. The results of the committee's first year of investigation were embodied in its Initial Report, entitled Equality of Treatment and Opportunity for Negro Military Personnel Stationed within the United States. It recommended steps to bring the Negro to a position of full equality

4. Permit holders were notified of the change in the licensing procedure and requested to exchange their former licenses for new ones, which would not contain racial designations. The change-over was delayed by Hurricane Camille, which interfered violently with all Parish business, but counsel for the defendant advised the court, in a letter dated October 9, 1969, that the new licenses had been issued to all persons holding Parish permits whose establishments were still operating.

5. But see National Foundation v. City of Fort Worth, 5 Cir. 1969, 415 F.2d 41, 45.

6. See, e. g., Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28 (Title VII, Civil Rights Act of 1964); Offner v. Shell's City, Inc., 5 Cir. 1967, 376 F.2d 574 (Title II, Civil Rights Act of 1964).

within the armed forces, and urged action to eliminate what it found to be "the serious off base discrimination by civilian communities affecting the morale of Negro military personnel and dependents."

President Kennedy referred the Gesell Report to Secretary of Defense McNamara with a strong endorsement of its recommendations, particularly those advocating efforts to open up the facilities of neighboring communities to Negro servicemen on an equal basis with white servicemen. The President declared, "This effort is required by the interests of our national defense, national policy and basic considerations of human decency."[7] In accordance with the President's request, Secretary McNamara issued a directive authorizing the Assistant Secretary of Defense (Manpower) to conduct a thorough-going campaign to eliminate the problems disclosed by the Report, and, *inter alia*, ordering each base commander "to oppose discriminatory practices affecting his men and their dependents and to foster equal opportunity for them, not only in areas under his immediate control, but also in nearby communities where they may live or gather in off-duty hours." The Assistant Secretary of Defense (Manpower) charged with this responsibility was Adam Yarmolinsky, now a professor at Harvard Law School.

The Gesell Report and the implementing directive were denounced by a number of public figures who had become identified with opposition to racial integration.[8] In addition to Ordinance No. 31, on the morning of August 29, 1963, the Plaquemines Parish Commission Council enacted two accompanying Resolutions; one condemned the Gesell Report as an attempt to weaken the armed forces and requested close congressional

scrutiny of the Report and its proponents; the other declared the U. S. Navy Joint Air Training Station at Belle Chasse to be off-limits to all citizens of Plaquemines Parish.[9]

At the time Ordinance No. 31 was adopted, the ordinances requiring racial segregation in establishments licensed to serve alcoholic beverages were still in effect. The defendant suggests that the withdrawal of those ordinances leaves Ordinance No. 31, once an integral part of the Parish's efforts to enforce racial segregation, untainted by the original unconstitutional design. She therefore maintains that Ordinance No. 31 violates neither the Fourteenth Amendment nor the Civil Rights Act of 1964.

## III. CONSTITUTIONALITY OF ORDINANCE NO. 31

This ordinance is perfidious as well as prejudiced. Even were it not designed to segregate the races, it would be unconstitutional. The men upon whom the nation has thrust the burden of its defense cannot arbitrarily be classified as unworthy to enter establishments purporting to serve the public. Soldiers and sailors, marines and airmen fulfilling their responsibility of national service are entitled at least to equal treatment, if not respect and consideration. A serviceman on active duty should not be obliged to hide his uniform as if it were a badge of disgrace in order to buy a beer in a bar.

The ordinance, on its face, violates the equal protection clause of the Fourteenth Amendment, since it is clearly arbitrary and unreasonable to single out military personnel in the uniform of any of the armed forces of the United States as a class against whom all establishments serving beer or liquor

---

7. Letter of President John F. Kennedy to Defense Secretary Robert McNamara, June 21, 1963 (copy filed in Record).

8. See, for example, the statements of a number of Southern Congressmen, reported in 109 Cong.Record 13548–98, August 7, 1963.

9. The minutes of the Council meeting at which these Resolutions and Ordinance No. 31 were enacted are reprinted in the official newspaper of the Plaquemines Parish Commission Council, the Plaquemines Parish Gazette, September 13, 1963. A copy is filed in the Record.

must discriminate. Moreover, no state interest, valid or otherwise, is offered to explain or justify the ordinance.

██ Classification alone does not *ipso facto* deprive the selected individuals of equal protection. However, a law that singles out one group for distinct treatment is constitutional only if the classification itself is not invidious,[10] if it is reasonably related to the end sought to be achieved by the legislation,[11] and if the law—as well as the classification—is designed to achieve a legitimate state objective.[12] "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal," McDonald v. Election Commissioners of Chicago, 1969, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739.

██ Of course, great deference is given the legislative evaluation of circumstances that led to a particular exercise of the state's police power. Nonetheless, the policy-making body may not act to circumscribe the freedom of a particular class for no reason, or for an unconstitutional reason. The record demonstrates that the Plaquemines Parish Commission Council had no purpose in enacting Ordinance No. 31 other than a desire to frustrate the effective implementation of the Gesell Report recommendations, at least within the area under the Council's jurisdiction. But if there is anything made clear by the Fourteenth Amendment it is that a governmental body cannot erect classifications designed to perpetuate racial segregation.

██ Where *rights* other than those of fundamental constitutional significance are restricted by a police power regulation,[13] the law should not be stricken if there are plausible grounds to support it. McDonald v. Board of Election Commissioners of Chicago, *supra*. However, no rational *and constitutional* basis for Ordinance No. 31 has been suggested and there is none presently apparent. This clearly is not the first step in a temperance program, with the Commission Council moving "one step at a time" to phase out the sale of alcoholic beverages in Plaquemines Parish. See Williamson v. Lee Optical Co., 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563. There is no evidence that the Commission Council considered servicemen as a group more likely to disturb the peace after being served alcoholic beverages. Even if this had been a consideration, the ordinance is not drawn to reach or prevent the assumed danger to public safety, as it prohibits service only to military personnel *in uniform;* nothing indicates the group might shed its presumed pugnaciousness along with

---

10. For example, classification according to race has been held to be *per se* invidious, McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222; in some contexts, so is classification according to means, Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169.

11. Rinaldi v. Yeager, 1966, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577; Levy v. Louisiana, 1968, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436; Kramer v. Union Free School District, 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583.

12. See, for example, Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.

13. Preferential treatment for specially protected rights began with the suggestion, in Justice Stone's famous Footnote Four, that the state has the burden of proof to justify police regulations impinging on First Amendment freedoms. United States v. Carolene Products Co., 1938, 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234. The doctrine has been expanded to afford preferential treatment to most personal rights guaranteed by the Constitution, see Shapiro v. Thompson, *supra*. For an illustration, contrast McGowan v. Maryland, 1961, 366 U.S 420, 81 S.Ct. 1101, 6 L.Ed.2d 393, with Reynolds v. Sims, *supra*. In both cases, geography was offered as the basis for classification in a state statute; where the right to vote was involved, the Court rejected the standard as invidious.

its government-issue apparel. It is possible that some civilians might be more likely to pick a fight with a serviceman in uniform than with someone not so identifiable, but this is hardly justification for discriminating against servicemen, rather than protecting them.[14]

It is ironic that this ordinance was adopted by public officials who had strenuously professed their patriotism, but here chose instead to demonstrate their parochiality.[15] The invidious character of this ordinance is thrown into sharp relief by the spectacle of political leaders, most vehement in urging "support for our boys" facing hostile bullets, attempting to submit those same young men to indignities and discrimination at home.

The United States Supreme Court held in Carrington v. Rash, 1965, 380 U.S. 89, 97, 85 S.Ct. 775, 780, 13 L.Ed.2d 675, "the uniform of our country must not be the badge of disfranchisement for the man or woman who wears it." Nor may the same uniform be the instrument of discrimination.[16] Ordinance No. 31 has no legitimate objective that cannot be served by a provision that does not invidiously discriminate against persons solely because they wear the uniform of their country.

IV. THE UNCONSTITUTIONALITY OF ORDINANCE NO. 31, ON GROUNDS OTHER THAN RACIAL DISCRIMINATION, MAY PROPERLY BE PASSED UPON

The validity of Ordinance No. 31 has properly been placed before this court by the government's complaint, which attacks the provision as irretrievably infected by the racial motivation of its enactment. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110. Necessarily the relief sought, declaration of the ordinance's unconstitutionality, contemplates consideration of its obvious discriminatory effect as well as its more subtle one.

All of the facts necessary for the disposal of the issue of the reasonableness of the ordinance's classification are before the court. Although the parties were originally concerned primarily with the ordinance's racial aspects, their attention was subsequently directed to the *per se* unconstitutionality of its classification. Both sides took advantage of the opportunity offered them to brief and discuss this issue, to present evidence and to clarify their positions with regard to the discrimination against servicemen in uniform.

In short, all matters relating to the constitutionality of Ordinance No. 31 were put in issue when the United States invoked the equity jurisdiction of this court to challenge the ordinance under the Fourteenth Amendment. Defendants had notice that compliance with Ordinance No. 31 was a question to be litigated, and that continued discrimination under that provision might be found to be illegal and unconstitutional. The issue was raised by the pleadings, explored fully in open court, and is ripe for judicial determination.

14. See Terminiello v. Chicago, 1949, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131; Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697.

15. Interestingly, the discussion of the measures was couched in terms of protecting America from allegedly hostile alien interests supporting the Gesell Report and implementing directive. Report of the proceedings of the August 29, 1963, Plaquemines Parish Commission Council Meeting, Plaquemines Gazette, September 13, 1963.

16. In Davis v. Mann, 1964, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609, a companion case to Reynolds v. Sims, *supra*, plaintiffs attacked Virginia's legislative apportionment. The Supreme Court rejected defendants' suggestion that the underrepresentation of three major urban areas was justifiable because of the large military population, saying: "Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible." 377 U.S. at 391, 84 S.Ct. at 1448.

## V. STANDING OF THE UNITED STATES

The Civil Rights Act of 1964, 42 U.S.C.A. § 2000a—5, authorizes the Attorney General, when he "has reasonable cause to believe that any person * * * is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter," to file suit "requesting such preventive relief, * * * as he deems necessary to insure the full enjoyment of the rights herein described." Among the rights referred to is the right to be free from discrimination "on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by" law, 42 U.S.C.A. § 2000a—1.

Thus the United States clearly has standing to question the constitutionality of Ordinance No. 31 on the basis of its racial motivation and purpose. The question of the Attorney General's authority to come into court to challenge an ordinance solely on the ground that it discriminates against servicemen actually does not arise here. The government properly placed the ordinance before the court for an adjudication of its validity, and, as pointed out above, the court may exercise its equity jurisdiction in order to arrive at a full and complete decision with regard to that validity. The statutory grant of standing permitted the United States to bring the ordinance into court; it does not circumscribe the area of unconstitutionality that the court is permitted to explore.

It is therefore unnecessary to determine whether the government might have standing to attack the ordinance if its discrimination were clearly directed only against servicemen. However, it should be noted that the government's standing to sue has been recognized, in the absence of statute, in a number of situations. In such cases, the courts have focused on the inherent power of the United States to protect those interests that the Constitution makes federal.[17]

Indeed, the government's interest and standing to sue to enjoin discrimination against military personnel might be supported by Article II, Section 2 of the Constitution, which confers on the President the title and responsibilities of Commander in Chief of the Armed Forces. As the Gesell Report itself makes clear, the treatment of military personnel in the communities surrounding the bases to which they are assigned has a significant effect on the well-being and morale of the armed forces, matters that are clearly of direct interest and concern to their Commander in Chief.

## V. RACIAL DISCRIMINATION

The defendant urges that she is not subject to the provisions of the Civil Rights Act of 1964 because she operates a bar in which no food is served.[18] This, of course, would not affect the legality of her compliance with Ordinance No. 31, under 42 U.S.C.A. § 2000a—1 or under the Fourteenth Amendment, but only the question whether an injunction should be issued against Mrs. Cantrell as proprietor of a "place of public accommodation" under

17. See In re Debs, 1895, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092; United States v. San Jacinto Tin Co., 1888, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747; United States v. American Bell Telephone Co., 1888, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450; P. E. Heckman v. United States, 1912, 224 U.S. 413, 32 S.Ct. 424; United States v. California, 1947, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889; United States v. Republic Steel Corp., 1960, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed. 2d 903; United States v. City of Jackson, 5 Cir. 1963, 318 F.2d 1.

18. Cuevas v. Sdrales, 10 Cir. 1965, 344 F.2d 1019. See Robertson v. Johnston, E.D.La.1966, 249 F.Supp. 618, reversed on other grounds, 5 Cir. 1967, 376 F.2d 43. This court expresses no opinion on the possible applicability of 42 U.S.C.A. § 1982 to racial segregation in retail facilities not covered by the 1964 Civil Rights Act.

§ 2000a, with respect to her private discrimination.[19]

■ There can be no doubt that any government action designed to aid, encourage or require racial discrimination is unconstitutional.[20] Nor can there be any serious question that Ordinance No. 31 was adopted for just that purpose. Both the preamble to the ordinance and the discussion that accompanied its consideration indicate that the provision was enacted as part of a plan to maintain segregation in public establishments in Plaquemines Parish.

As implied in the preamble, the ordinance was designed to meet the threat posed by the Gesell Report to the Plaquemines Parish way of life. More specifically, as the report of the discussion demonstrates, the Parish Commission Council was particularly troubled by two important proposals made in the Report: first, the suggestion that base commanders be encouraged to use their influence and possibly their economic power in communities adjoining military installations in order to bring about voluntary desegregation of public accommodations in those communities; second, the thesis that total social integration *within* the armed forces is a military goal.

By prohibiting "parish licensed operators of bars and lounges from admitting any uniformed military personnel" and from "selling, giving or serving any such personnel any beer, liquor, beverage or incidentals," the ordinance plainly aims at thwarting any efforts taken by the commanding officer of the Belle Chasse U. S. Navy Joint Air Training Station to obtain voluntary agreements from such operators to provide racially nondiscriminatory service.

In addition, the ordinance has more subtle discriminatory effects. The report suggests that a base commander unsuccessful in bringing about voluntary desegregation agreements should declare offending establishments off limits to all servicemen under his command. The implementing directive, however, states that this sanction may not be employed without the prior approval of the Secretary of the commander's branch of the armed forces. Nevertheless, the ordinance would aid and encourage white servicemen to disobey such an off-limits order, by making sure that white military personnel seeking alcoholic refreshment would not come to town in uniforms, by which they could be readily identified by the Military Police.

Finally the ordinance stands as an official and formal statement of the opposition of the Parish governing body to the ideals expressed in the Gesell Report, ideals embodied in the Fourteenth Amendment and in the Civil Rights Act of 1964.

■ These racially discriminatory motives, as well as the arbitrary selection of uniformed servicemen as a class, render the ordinance unconstitutional. The fact that the ordinance does not explicitly mention race in its text proper is immaterial, for "[A]cts generally lawful may become unlawful when done to accomplish an unlawful end." Gomillion v. Lightfoot, 1960, 364 U.S. 339 at 347, 81 S.Ct. 125, at 130, 5

---

19. It is possible that the sale of food in some of the establishments operated by members of the defendant class is so substantial that those establishments would be "places of public accommodation" within the definition of 42 U.S.C.A. § 2000a(b) (2) or (b) (4). Fazzio Real Estate Co. v. Adams, 5 Cir. 1968, 396 F.2d 146. However, the applicability of those provisions to the various class members would depend on the individual factual situation of each establishment, matters that are not appropriate for class disposition under Rule 23. The present action can only determine the responsibilities of class members under the sections of the Civil Rights Act equally applicable to all, and this decision intimates no opinion on the possibility of obligations created by other sections.

20. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830.

L.Ed.2d 110. See also Griffin v. Board of Education of Prince Edward County, 1964, 377 U.S. 218 at 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 and Cooper v. Aaron, 8 Cir. 1958, 261 F.2d 97 at 104, *affirmed*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. Nor does the fact that the ordinance applies equally to white servicemen cure its constitutional infirmities. Anderson v. Martin, 1964, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430; McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222. It is segregation by race that is unconstitutional, whether the state order compelling such segregation is directed invidiously at blacks, at whites, or at both.

The cocktail lounges run by Mrs. Cantrell and other members of the class she represents may not be "places of public accommodation" as covered by Section 201 of the Civil Rights Act, 42 U.S.C.A. § 2000a. But racial segregation within her bar as a result of Ordinance No. 31 clearly violates Section 202 of the Act, 42 U.S.C.A. § 2000a—1, which reads in part:

> All persons shall be entitled to be free, at *any* establishment or place, from discrimination or segregation of *any kind* on the ground of race, * * * if such discrimination or segregation is or purports to be required by any * * * ordinance * * * of a State * * * or political subdivision thereof. [emphasis added]

Certainly the underlying purpose of Ordinance No. 31 is the perpetuation of racial segregation. Therefore, having been enacted on the ground of race, for the purpose of requiring defendant and her class to discriminate, Ordinance No. 31 falls within the scope of Section 202. Congress may have chosen to exempt Mrs. Murphy's boardinghouse from the coverage of Section 201 of the 1964 Civil Rights Act,[21] but the Act's limitations were not designed to permit Mrs. Cantrell's bar to exclude uniformed servicemen pursuant to a racially motivated ordinance.

Hence, judgment will be rendered declaring Ordinance No. 31 unconstitutional and enjoining the defendant and all members of the class sued from denying service to men and women in the uniform of the armed forces of the United States, whatever their race may be.

---

21. In debating the extent of coverage of the public accommodations section of the Civil Rights Act, a number of senators expressed solicitude for the right of one who rents out rooms in his home to exclude persons who would not be welcome as guests. This hypothetical situation was described as "Mrs. Murphy's boardinghouse," and the Act exempts "an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence," 42 U.S. C.A. § 2000a(b) (1).