**Harry H. and Thelma GIBBS et al.**

**v.**

**William A. TITELMAN, Individually and as Director of the Bureau of Motor Vehicles of the Commonwealth of Pennsylvania, et al.**

**Civ. A. No. 72–2165.**

United States District Court,
E. D. Pennsylvania.

Nov. 8, 1973.

David A. Scholl, Chester, Pa., Jonathan Stein, Philadelphia, Pa., for plaintiffs, and James R. Adams, Harrisburg, Pa., for Commonwealth of Pa.

W. Bradley Ward, Ira P. Tiger, Roger M. Whiteman, Oliver C. Biddle, Leonard C. Homer, John J. Brennan, Tyson W. Coughlin, David L. Creskoff, George J. Miller, Philadelphia, Pa., for defendants.

## OPINION

BECHTLE, District Judge.

On November 2, 1972, the above-named plaintiffs, purporting to act as a class, filed a complaint seeking to have a Pennsylvania state statutory scheme involving the repossession of motor vehicles declared unconstitutional;[1] and to have defendant, General Motors Accept-ance Corporation ("GMAC"), and all parties purported to be similarly situated, enjoined from continuing to effect extrajudicial nonconsensual repossessions of motor vehicles. The complaint also sought to have the defendant, William A. Titelman, Pennsylvania Director of the Bureau of Motor Vehicles, enjoined from permitting the transfer of titles of motor vehicles repossessed in the above manner.

The litigation surrounding this action involved many issues, each of which were thoroughly briefed and argued at the several hearings and pretrial conferences had in this case over a period of months. Several memorandum opinions and orders, ruling on pretrial issues, were issued by the Court. Below is a chronological discussion of the pretrial issues and rulings in this case, followed by the Court's findings of facts and conclusions of law.

### I. Temporary Restraining Order

On November 2, 1972, along with the complaint, the plaintiffs filed a motion for a Temporary Restraining Order ("TRO")[2] which sought:

(1) To immediately restrain defendant Titelman from transferring title of any nonconsensually repossessed motor vehicle in Pennsylvania;

(2) To immediately restrain defendant Auto-Road, Inc., from selling the automobile of named plaintiff Ella Lemar, which it had earlier repossessed; and,

(3) To order Auto-Road, Inc., to return plaintiff Lemar's automobile.

The granting of a TRO is predicated upon a finding of immediate and irreparable harm. See, Fed.R.Civ.P. 65. An

---

1. The statutes in question are: 69 P.S. § 623 (Repossession), § 624 (Reinstating of Contract After Repossession), § 625 (Redemption and Termination of Contract After Repossession), § 626 (Sale of Motor Vehicle After Repossession), and § 627 (Deficiency Judgment); also challenged are certain sections of the Uniform Commercial Code, as adopted in Pennsylvania, insofar as they give a secured creditor the summary right of re-possession upon default. 12A P.S. § 9–503 (Secured Party's Right to Take Possession After Default), and § 9–504 (Secured Party's Right to Dispose of Collateral After Default; Effect of Disposal).

2. Two days previous, oral notice of the intention to file the application for a TRO was given to defendants Titelman, GMAC, and Auto-Road, Inc.

informal hearing was held on the motion for a TRO on the same day; counsel appeared for the plaintiffs, GMAC, and Titelman. No one appeared for the defendant Auto-Road, Inc.

The Court denied the relief sought against defendant Titelman, for the reason that it did not appear from the specific facts sworn by the verified complaint that anything Titelman did caused the applicants the irreparable harm of which they complained. The Court also denied the application to order Ella Lemar's automobile returned to her for the reason that, until the evidence was introduced in an adversary proceeding on the validity of the statutes, it was not at all clear who had a greater right to the possession of the automobile in question. The Court did, however, grant the temporary restraint of the sale of the Lemar automobile by Auto-Road, Inc. On that point, the Court found that the facts sworn to by the plaintiffs showed that immediate and irreparable harm would result to Mrs. Lemar if the sale of her automobile were not temporarily restrained.

On November 9, 1972, a formal hearing was held to determine whether the TRO entered on November 2 as to the sale of the Lemar automobile should be extended. At the time of that hearing, an agreement was entered into by the owner of Auto-Road, Inc., and counsel for the Lemars. This agreement, involving possession and payments on the automobile, settled the private dispute between the Lemars and Auto-Road, Inc., thereby mooting the issue of extending the TRO.[3]

At the November 9, 1972, hearing, the Court also entertained argument from all interested parties at this point in the proceedings as to:

(1) The jurisdictional question of whether or not this is a proper case for convening a three-judge court pursuant to 28 U.S.C. § 2281 and § 2284; and,

(2) Whether jurisdiction lies for a single judge to hear this matter pursuant to 28 U.S.C. § 1343(3) and § 1343(4).

## II. Three-Judge Court

28 U.S.C. § 2281, entitled "Injunction Against Enforcement of State Statute; Three-Judge Court Required," states:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

By its terms, § 2281 embraces only those cases in which an interlocutory injunction is sought to prevent the operation of a state statute "by restraining the action" of a state officer "in the enforcement or execution of such statute." Wilentz v. Sovereign Camp, W. O. W., 306 U.S. 573, 580, 59 S.Ct. 709, 713, 83 L.Ed. 994 (1939). Here, it appears on the face of the complaint that the statutes assailed are those prescribing a right of summary repossession. (See paragraphs 5 and 46 of the Complaint.) Although Titelman, a state officer, is named in the complaint,[4] it is well settled that a state officer cannot be named perfunctorily or as a nominal defendant in an attempt to attain the necessary official action. Moody v. Flowers, 387 U.

---

3. The class action issues on the constitutionality of the statutes in question, as applied to these two parties, remained intact. See, Rule 23(e), Fed.R.Civ.P.

4. Although the plaintiffs do not mention the statute under which Titelman is empowered to act (75 P.S. § 208) at all in the body of the complaint, they seek a declaration of its unconstitutionality, as it applies to nonconsensual extrajudicial repossessions, in their prayer for relief.

S. 97, 101–102, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1966); Wilentz v. Sovereign Camp, W. O. W., *supra,* 306 U.S., at pp. 579–580, 59 S.Ct. 709.

Neither Titelman nor any other state officer is clothed with the authority to enforce these statutes. The alleged deprivation prescribed by the statutes takes place before any action or indeed any knowledge on the part of defendant Titelman, comes into play. Enjoining Titelman would not redress this deprivation.

The statute under which Titelman acts is 75 P.S. § 208, entitled "Change of ownership by operation of law and judicial sale." The statute provides that, in the case of a transfer of ownership or possession of a motor vehicle, by operation of law (*e. g.,* inheritance, an order in bankruptcy, or repossession, etc.), it becomes the duty of the one in possession of the motor vehicle to surrender the Certificate of Title to the person to whom possession has so passed. The secretary (Titelman), upon surrender of the outstanding Certificate of Title, or upon presentation of satisfactory proof to the secretary of ownership and right of possession to such motor vehicle, then issues to the new possessor a Certificate of Title.

Nothing in this statute provides for an extrajudicial deprivation of property. Assigning a Certificate of Title does not confer possession or ownership in anyone.[5] In fact, "satisfactory proof of ownership and right to possession must exist" before a Certificate of Title can be assigned. We can see no language on the face of this statute (75 P.S. § 208) which would make it constitutionally suspect, and the plaintiffs have not alleged any facts to show that it is unconstitutional as applied. For these reasons, we find the jurisdictional prerequisite of action by a state officer absent and, therefore, must refuse, under 28 U.S.C. § 2281, the request to have a Three-Judge Court empaneled.

### III. *State Action*

Plaintiffs also seek to invoke jurisdiction of the District Court under 28 U.S. C. § 1343(3) and § 1343(4).[6] Section 1343(3) states:

"The District Courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

The statutory schemes in question, 69 P.S. §§ 623–627 and 12A P.S. § 9–503 and § 9–504, prescribed a right in a seller (also holder or secured creditor) to summarily repossess property which is the subject of a contract (or security agreement) when the buyer is in default under that contract. 69 P.S. §§ 623–627 are specifically limited to repossessions of motor vehicles pursuant to installment sales contracts.

The sole question for determination of this jurisdictional issue is whether the actions of the defendants in repossessing motor vehicles are performed "under color or any State law, statute ordinance, regulation, custom or usage . . ."

---

5. The primary purpose of the act (assignment of Certificate of Title, was not designed to establish the ownership or proprietorship of an automobile, but rather to register the name and address of a person having the right to possession, and to furnish persons dealing with one in possession of an automobile a means of determining whether such possession was prima facie lawful.

Semple v. State Farm Mutual Automobile Insurance Co., 215 F.Supp. 645, 647 (E.D. Pa.1963).

6. This section is the jurisdictional counterpart of 42 U.S.C. § 1983, which entitles a person to bring a civil action to redress the deprivation of rights secured by the Constitution and laws of Congress.

This exact issue has been litigated recently be a number of Federal and state courts. The majority of them hold that the act of self-help repossession is not performed "under color of any State law." See, Adams v. Southern California First National Bank, 492 F.2d 324, (9th Cir. 1973); McCormick v. First National Bank of Miami, 322 F.Supp. 604 (S.D.Fla.1971); Oller v. Bank of America, 342 F.Supp. 21 (N.D.Cal. 1972); Greene v. First National Exchange Bank of Virginia, 348 F.Supp. 672 (W.D.Va.1972); Kirksey v. Theilig, 351 F.Supp. 727 (D.Colo.1972); Pease v. Havelock National Bank, 351 F.Supp. 118 (D.Neb.1972); Colvin v. Avco Financial Services, 12 UCC Rep.Serv. 25 (D.Utah 1973); Shirley v. State National Bank of Connecticut (D.Conn.1973); Turner v. Impala Motors (W.D.Tenn. 1973); Mayhugh v. Bill Allen Chevrolet (W.D.Mo.1973); Kinch v. Chrysler Credit Corporation, 367 F.Supp. 436 (E. D.Tenn.1973); Messenger v. Sandy Motors, Inc., 121 N.J.Super. 1, 295 A.2d 402 (1972); Brown v. United States National Bank of Oregon, 509 P. 2d 442 (Or.1973); Giglio v. Bank of Delaware, Del.Ch., 307 A.2d 816 (1973); Northside Motors of Florida, Inc. v. Brinkley, 282 So.2d 617 (Sup.Ct.Fla. 1973). Courts taking the opposite view include: Michel v. Rex-Noreco, 12 UCC Rep.Serv. 543 (D.Vt.1972); Boland v. Essex County Bank and Trust Co., 361 F.Supp. 917 (D.Mass.1973); James v. Pinnix (S.D.Miss.1973); Chrysler Credit Corp. v. Dinitz (Kings County, New York, Civil Court 1972).

The courts that have refused to find sufficient state involvement have done so for various reasons. One ground, determinative of a number of the cases supporting the defendants' view, is that self-help repossessions, such as the ones questioned herein, come from a well-established heritage in the common law, which has precedential value that exists notwithstanding the remedy's statutory

codification. See, Adams v. Southern California First National Bank, *supra;* Oller v. Bank of America, *supra*; Green v. First National Exchange Bank of Virginia, *supra*; Kirksey v. Theilig, *supra*; Pease v. Havelock National Bank, *supra*; Mayhugh v. Bill Allen Chevrolet, *supra*; Colvin v. Avco Financial Services, *supra*.

That self-help repossession has its ancestry in common law is well settled; what is not well settled, however, is that it ever was a sound historic principle with any precedential value.

### (A) *Distraint at Common Law*

Self-help repossession comes from the common law principle of distress or distraint. "A distress is the taking of a personal chattel without legal process from the possession of a wrongdoer into the hands of the party aggrieved, as a pledge for the redress of an injury, the performance of a duty, or the satisfaction of a demand." [7]

Self-help is one of the oldest principles of law. Man's natural impulse, upon being injured by another, is to punish the wrongdoer and compel him to make reparation. Prior to its reaching elementary stages of sophistication, all law was based on the principle of self-redress.

From the earliest recordation of legal history, there were powerful efforts to check, guide, and ultimately eliminate extrajudicial distraint. In Roman law, the extrajudicial right of seizure by an individual creditor could be properly exercised only in a few well-defined cases. Under Teutonic law, the remedy was strictly regulated. A succession of demands had to be made on the debtor in solemn form by complaint. Three witnesses had to accompany the creditor to the house of the debtor. If there were still a refusal by the debtor, the creditor had to summon him before the court for an injunction against the debtor from disposing of the goods to be distrained.[8]

---

7. 3 Street, The Foundations of Legal Liability, 278 (1906) (hereinafter "Street"); see also, I Bradby on Distress.

8. Street, at pp. 280–282.

Under Lombard law, distraint could take place after a demand. The law of the Bavarians and Ostrogoths prohibited distress unless the authority of the judge was first obtained. Visigothic law expressly prohibited it. "The lawmakers everywhere made war against the institution, and apparently sometimes forbade altogether what they could not control." [9]

In England, as a result of the continuing efforts to bring distress into subjection to the law, the remedy had ceased to be an extrajudicial remedy long before the Norman Conquest (1066). At that point in time, its utility had dissipated to a level of merely compelling attendance at courts or enforcing judgments; but in no case could a man distrain on his own.[10]

Self-help distraint, practically extinct due to years of decay through the natural process of legal evolution, was for unique reasons revived during feudalism.

As a system, feudalism was based on a peculiar tenure of land.[11] The existence of a tenant's estate depended upon his performance of certain feudal duties, nonperformance of which could result in a forfeiture of the land. As an alternative to the harshness of this remedy, distraint took on new life: A means of enforcing services due the lord from the tenant.[12]

Not long after the nobility had returned the remedy to an *ex parte* and extrajudicial proceeding, outcries were heard from the tenants that the remedy was being used as a means of oppression. As a result of the opposition to the remedy, the first attempt at statutory regulation of distress was made: The Statute of Marlboro, in 1267. This codification of the remedy is perhaps one reason for its survival beyond the decay of the system of tenure and the subsequent development of the law of *assumpsit*.[13]

A most accurate description of the history of this self-help remedy, and its utility in our legal system, is given by Professor Street in his treatise on Foundations of Legal Liability:

"That normal legal growth must be fatal to the remedy of distress is apparent. It is not only extrajudicial; it is strictly anti-social and anti-legal. It is opposed to fundamental legal conceptions. It can never be tolerated that a man should at the same time be both judge and executive officer in his own behalf. But this is really what distress implies, and in this we see the reason why so much counterbalancing machinery has been built up around the institution wherever it has survived. The first articulate voice of the law is against it. If a system of law fully adapted to the capacity and purpose of man could come into existence without regard to antecedent conditions, distress would certainly have no place in it. Legal evolution tends to bring all procedure into the category of legal process, and thus to eliminate self-help altogether. We, therefore, see early law gradually and surely disentangling itself from the meshes of this primitive institution." Street, at p. 285.

It is most puzzling, therefore, that extrajudicial distraint, with or without the aid of a state officer, has been accepted by many jurisdictions in modern times.[14]

9. *Id.*, at p. 283.

10. *Id.*, at p. 285.

11. Tenure is the mode or system of holding lands or tenements in subordination to some superior which, in feudal ages, was the leading characteristic of real property. Black's Law Dictionary, 1639 (4th Ed. 1951).

12. Street, at p. 287.

13. *Id.*, at p. 289, 290.

14. Only recently, following the trend of cases condemning similar prejudgment seizures, has distraint-for-rent been ruled unconstitutional by the courts. See, Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970); Gross v. Fox, 349 F.Supp. 1164 (E.D.Pa. 1972); Hall v. Garson, 430 F.2d 430 (5th Cir. 1970); Barber v. Rader, 350 F.Supp. 183 (S.D.Fla.1972); Dielen v. Levine, 344 F.Supp. 823 (D.Neb.1972).

Certainly, our judicial system is sophisticated enough to redress the injuries which once gave rise to the need for self-help, notwithstanding the constitutional proscription against a deprivation of property without due process.

Consequently, this Court does not agree with the courts that have found that modern-day self-help is a historically sound principle of the common law.[15] ". . . The fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection to all property in its modern forms." Sniadich v. Family Finance Corporation of Bay View, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). The peculiarly feudal remedy of distraint, criticized throughout the history of English common law, ought never have been deemed applicable to the American state of society.[16]

15. The self-help repossession of today only vaguely resembles the remedy of distraint which did exist at various times in the common law. The only two types of distraint which are categorized by the commentators are: Distress Damage Feasant, which allowed the distrainor to impound trespassing beasts until their owner paid for the damage which they had caused; and Distress for Rent. See, 3 W. Lewis, Blackstone's Commentaries 6, 7 (1898); 3 W. Holdsworth, A History of English Law 281 (1923).

Nowhere in the common law does there exist the right of the distrainor to sell the goods seized. That is wholly a creature of statute. 3 W. Lewis, Blackstone's Commentaries at 6 n. 16.

16. The court in Adams v. Southern California First National Bank, *supra*, made the observation that ". . . it does not appear likely that the Fourteenth Amendment, when written, was intended to eliminate summary self-help in light of the prevailing use of peaceful repossession." (492 F.2d at p. 337.)

Apparently, for over 100 years, it did not appear likely that the Fourteenth Amendment was intended to eliminate summary seizures, even where there was no question of the state's involvement; however, since the Supreme Court's 1969 decision in Sniadach v. Family Finance Corporation of Bay View, *supra*, a great number of summary seizure state statutes have been invalidated under the Fourteenth Amendment.

(B) *Passive State Action*

Another reason the courts have given for refusing to find "color of law" has been that the involvement of the state in the repossession scheme is only passive, and not significant. See, Adams v. Southern California First National Bank, *supra*; Green v. The First National Exchange Bank of Virginia, *supra*; Kirksey v. Theilig, *supra*. Passive state action exists where a statute merely allows for a certain act of a private individual to occur; while active or direct state action exists when a statute compels an event, or a state official acts in concert or on behalf of an individual in performing the act. This Court does not subscribe to this distinction as a basis for determining "color of state law," where deprivation of one individual's property by another individual is at stake.[17]

Other examples of what the Fourteenth Amendment has been held to prohibit, which, when enacted, the Amendment did not appear to proscribe, are legion. See, U. S. v. Mosley, 238 U.S. 383, 388, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

17. It could be argued, as the plaintiffs have done, that the "Motor Vehicle Sales Finance Act" of Pennsylvania (hereinafter "the Act"), 69 P.S. § 601 et seq., as opposed to the corresponding Uniform Commercial Code provisions, 12A P.S. § 9–503 and § 9–504, constitutes direct state action. The Act sets forth as its "Findings and Declaration of Policy" (69 P.S. § 602) that ". . . it is hereby declared to be the policy of the Commonwealth of Pennsylvania to . . . . bring under the supervision of the Commonwealth all persons engaged in the business of extending consumer credit in conjunction with the installment sale of motor vehicles; to establish a system of regulation for the purpose of insuring honest and efficient consumer credit service for installment purchasers of motor vehicles; and to provide the administrative machinery necessary for effective enforcement." The Act provides that all "installment sellers," "sales finance companies," and "collector repossessors" be licensed. (69 P.S. § 604.) The Act delineates the contents of an installment sales contract and provides for a specific provision as to the buyer's liability with respect to repossession. (69 P.S. § 614(E).) The Act specifically sets forth the manner

■ When a statute or even a common law custom [18] allows an individual to unilaterally transcend the fundamental and inalienable level of equality, incident to all dealings between people in this country, that statute is clothing the individual with a power which can only truly be consistent with the state. It is this power, given an individual by the state, that constitutes "state action."

In holding the replevin statutes unconstitutional, the Supreme Court in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), described this power thusly:

> "The statutes, moreover, abdicate effective state control over *state power*. Private parties, serving their own private advantage, may unilaterally invoke *state power* to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." 407 U.S. at 93, 92 S.Ct. at 2001. (Emphasis added.)

The state power of which the Court speaks in the replevin statutes, as well as the self-help repossession statutes, is not the power to have a deputy sheriff or constable act as your collection agency, but is rather the power to decide that your rights are greater than another's. This power has no less an impact on the person whose goods are taken when the state does not compel that the power be used.

■ Therefore, even by merely permitting self-help repossession, such permission is a license to perform a state function and, as such, comes under the umbrella of the Fourteenth Amendment.

In applying this type of analysis to the question of state action, the court in Hall v. Garson, *supra,* a case which involved a constitutional challenge of a state statute that allowed for self-help extrajudicial distraint by a landlord, stated that:

> " . . . the entry into another's home and the seizure of another's property, was an act that possessed many, if not all, of the characteristics of an act of the State." 430 F.2d at 431.

Consequently, the court held that the statute clothed the landlord with the authority of the state and his action constituted state action. See, Barber v. Rader, *supra;* Dielen v. Levine, *supra.*

### (C) *Constitutionally Protected Rights*

To date, several cases dealing with the issue involving statutes allowing for self-help repossession of motor vehicles have concluded that sufficient state action exists to bring the matter within the jurisdiction of the Federal Courts, solely by reason of the permissive nature of these statutes. See, Michel v. Rex-Noreco, *supra;* James v. Pinnix, *supra;* Boland v. Essex County Bank and Trust Co., *supra;* Chrysler Credit Corp. v. Dinitz, *supra.*

In these decisions, the courts based their findings of state action on the rulings in several Supreme Court cases, most notably Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830

---

in which self-help repossession is sanctioned. (69 P.S. § 623.) Finally, the Act provides for criminal penalties for violations of any of its provisions (69 P.S. § 637.).

Since we do not subscribe to the active-passive dichotomy for the purpose of determining "color of state law," we do not here decide whether the Pennsylvania "Motor Vehicle Sales Finance Act" constitutes direct state action.

18. 28 U.S.C. § 1443 confers jurisdiction on the Federal District Courts to redress deprivations " . . . under color of any State law, statute, ordinance, regulation, *custom* or usage . . ." (Emphasis added.)

It would seem that even a common law custom, accepted by a state, would come within the expansive scope of this statute.

(1967) and Adickes v. S. H. Kress & Co., Inc., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Reitman v. Mulkey affirmed a lower court's ruling that a section of the California constitution which prohibited restrictions on an individual's right to sell property to whomever he chooses was unconstitutional. Despite the fact that all parties were private individuals and no state official or personnel were involved, the Supreme Court found that the enactment of this section encouraged and involved the state in private discriminations. The cases cited by the plaintiffs found the analogous state involvement in the self-help repossession setting.

Adickes v. S. H. Kress & Co., Inc., *supra,* another case involving racial discrimination, also affirmatively set forth the proposition that action purely by a private individual can constitute action "under color of state law." In a concurring opinion, Mr. Justice Brennan stated:

"When private action conforms with state policy, it becomes a manifestation of that policy and is thereby drawn within the ambit of state action." 398 U.S. at 203, 90 S.Ct. at 1626.

The cases supportive of the defendants' view have distingushed the plaintiffs' reliance on *Reitman* and *Adickes* by stating that these decisions were necessary to combat the substantive evil of racial discrimination, and that " . . . the historical, legal and moral considerations fundamental to extending Federal jurisdiction to meet racial injustices are simply not present in the instant case." Oller v. Bank of America, *supra*; see also, Adams v. Southern California First National Bank, *supra*; Kirksey v. Theilig, *supra*; Pease v. Havelock National Bank, *supra*.

It is true that the "Civil Rights Act of 1871," 17 Stat. 13, the predecessor of 42 U.S.C. § 1983, was established to counter the outrages committed by the Ku Klux Klan against the Negro population in the South. The early cases enforcing this statute restricted its scope to this end. However, when Congress superceded the 1871 Act, it broadened the language and purpose of the statute to encompass a substantive remedy for violation of any constitutionally protected right. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

In United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915), Mr. Justice Holmes, commented on Section 6 of the Enforcement Act of 1870, 16 Stat. 141, as amended, now 18 U.S.C. § 241, in words applicable to § 1983:

"Just as the Fourteenth Amendment . . . was adopted with a view to the protection of the colored race but has been found to be equally important in its application to the rights of all, [the statute] had a general scope and used general words that have become the most important now that the Ku Klux have passed away . . . [W]e cannot allow the past so far to affect the present as to deprive citizens of the United States of the general protection which on its face [the statute] most reasonably affords." 238 U.S. at 388, 35 S.Ct. at 906.

Since Congress has chosen not to distinguish between constitutionally protected rights in § 1983, this Court can only assume that the amount of state involvement necessary to constitute "color of state law" for a deprivation of one constitutional right would equal the amount of state involvement necessary for another constitutional right.

A number of cases, not involving racial discrimination, have followed this theory and extended the *Reitman* rationale. See, Hall v. Garson, *supra* (landlord's distraint case); Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 153 (6th Cir. 1973) (private utility termination case); Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970) (innkeeper's lien); Hill

v. Toll, 320 F.Supp. 185 (E.D.Pa.1970) (bail bondsman case).

Finally, within the past few years, a host of state statutes which permitted summary seizure prior to notice and hearing have been held constitutionally invalid. Most of these statutes had certain characteristics in common; typically, the statute had roots in the common law and it served a creditor interest rather than a state interest. Most of these statutes struck down provided for a state officer to act at some point in the process, usually in the capacity of a collection agent without the power to make any judicial determination of the rights of the parties involved. Some of the statutes permitted self-help. We find the case at hand substantively indistinguishable from this line of cases, in all of which "color of state law" was found to exist. A sampling of these cases include: Sniadach v. Family Finance Corporation of Bay View, *supra*; Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); Fuentes v. Shevin, *supra*; Hall v. Garson, *supra;* Santiago v. McElroy, *supra*; Klim v. Jones, *supra;* Laprease v. Raymours Furniture Company, 315 F.Supp. 716 (N.D.N.Y.

1970); Ford v. Dean's O.K. Tire Store, Inc. (D.Nev.1973).

## IV. *Class Action*

In their complaint, plaintiffs set forth allegations in support of their contention that this suit should proceed as a class action on the part of both plaintiffs and defendants.

On December 1, 1972, the plaintiffs filed a motion for determination of the classes.

On January 9, 1973, the Court decided that the case should be maintained as a class action on behalf of certain plaintiffs and certain defendants. The respective classes were defined as follows:

The class of plaintiffs shall include all "persons"[19] within the Eastern District of Pennsylvania who are "installment buyers" or "buyers"[20] within the meaning of those terms set forth in the "Motor Vehicle Sales Finance Act" (hereinafter "Act"), 1947, June 28, P.L. 1110, § 3, 69 P.S. § 603, and who have had their motor vehicles repossessed extrajudicially and without their voluntary consent[21] under color of statutes challenged herein, 69 P.S. §§ 623–627 and 12A P.S. §§ 9–503, 9–504.

The class of defendants shall include all persons to whom a license has been issued under the Act as an "installment seller,"[22] or "sales finance compa-

---

19. 69 P.S. § 603(2): "Person" includes an individual, partnership, association, business corporation, banking institution, non-profit corporation, common law trust, joint stock company and any other group of individuals, however organized.

20. 69 P.S. § 603(3): "Installment buyer" or "buyer" shall mean the person who buys, hires or leases a motor vehicle under any installment sale contract or legal successor to any such person and shall continue to designate such person notwithstanding he may have entered into one or more extensions, deferments, renewals, or other revision of the original contract, and includes any person who as surety, endorser, guarantor, or otherwise, is liable for the obligation created by the buyer under an installment sale contract.

21. The type of consent contemplated here is that which is given at or near the time the repossession is impending, and not the type that is evidenced merely by a signature on the standard installment sales agreement, which adopts the repossession provisions within. Whether the latter type is actually consent at all is constitutionally suspect (see, Swarb v. Lennox, 314 F.Supp. 1091 (E.D.Pa.1970); Santiago v. McElroy, *supra*), and is in dispute in this case. (See discussion *infra*.)

22. 69 P.S. § 603(4): "Installment seller" or "seller" shall mean a person engaged in the business of selling, hiring or leasing motor vehicles under installment sales contracts or any legal successor in interest to such person.

ny," [23] or as a "collector-repossessor," [24] in the Eastern District of Pennsylvania, within the meaning of those terms defined in the Act, who either have carried out extrajudicial, nonconsensual repossessions or may do so in the future under color of the state laws challenged herein.

On January 26, 1973, defendant GMAC filed a motion for reconsideration of the Court's determination. Subsequently, several of the new class defendants joined in this motion. The plaintiffs opposed this motion and moved to have the class definitions expanded.

On March 16, 1973, the Court held a hearing in which all counsel argued their respective positions. Following the hearing, the Court issued a Memorandum Order denying the defendants' motion and amending the classes as requested by the plaintiffs to include the following:

The plaintiffs' class shall also include all persons within the Eastern District of Pennsylvania who, for the purpose of purchasing a motor vehicle, have obtained a loan from a banking institution (within the meaning of that term defined in the Pennsylvania "Motor Vehicle Sales Finance Act"), which banking institution has taken in the loan agreement a concomitant security interest in the motor vehicle being purchased; and who, further, have had, or may in the future have, their motor vehicles repossessed by such banking institution, extrajudicially and without their voluntary consent under color of the statutes challenged herein. The defendants' class shall also include all banking institutions within the Eastern District of Pennsylvania who extend loans to be used for the purchase of motor vehicles and who provide in the loan agreement for a concomitant security interest in the motor vehicle being purchased; and who, further, have carried out extrajudicial, nonconsensual repossession of motor vehicles or may do so in the future, under color of statutes challenged herein.

■ To maintain an action as a class action, the requesting party has the burden of showing that the prerequisites of Fed.R.Civ.P. 23(a) are met; i. e., (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and, (4) the representative parties will fairly and adequately protect

23. 69 P.S. § 603(6): "Sales finance company" shall mean a person engaged as principal, agent or broker in the business of financing or soliciting the financing of installment sales contracts made between other parties, including but not thereby limiting the generality of the foregoing, the business of acquiring, investing and/or lending money or credit on the security of such contracts or any interest therein whether by discount purchase or assignment. thereof, or otherwise: Provided, that the terms shall not include any person to the extent that he makes bonafide commercial loans to sellers or sales finance companies and takes assignments of, or an interest in, an aggregation of installment sales contracts only as security for such commercial loans under which, in the absence of default or other bonafide breach of the loan contract, ownership of such contracts remains vested in the assignor and collection of such payments on such contracts is made by the assignor. The terms shall include any seller, whether or not licensed under this act, as a seller who finances installment sale contracts for other sellers or sales finance companies.

24. 69 P.S. § 603(7): "Collector-repossessor" shall mean a person who collects payments or installment sale contracts, or repossesses motor vehicles, which are the subject of installment sales contracts as an independent contractor and not as a regular employee of a seller or sales finance company, excluding duly constituted public officials or attorneys at law when acting in an official capacity, and excluding a licensed seller or licensed sales finance company making collections or repossessions on installment sale contracts wherein such seller or sales finance company was previously a "holder" or wherein such seller or sales finance company not having previously been a "holder," occasionally makes collections or repossessions for other licensed sellers or sales finance companies. The term shall include any combination of the above activities.

the interests of the class. In addition, the moving party must prove the existence of one of the enumerated requirements of Rule 23(b).

That the respective classes are so numerous that joinder of all members is impractical is clear. Pursuant to the Court's request, counsel for the Commonwealth of Pennsylvania informed the Court that, as of November 30, 1972, there were 5,220 installment sellers, 1,014 sales finance companies, and 44 collector-repossessors licensed under the Act. The installment sales contract is the most common method of purchasing a motor vehicle.

That there is a common question of law is also clear. The validity of the statutory scheme relating to the repossession of motor vehicles, as it pertains to both classes, comprises the substance of this action.

Since the statutes in question do not compel extrajudicial repossession, the defendants argue that their constitutionality can only be determined "as applied." This, they reason, precludes a finding that there are questions of law in common.

In upholding the ruling of facial unconstitutionality of the landlord's distraint provisions of the Pennsylvania "Landlord and Tenant Act," 68 P.S. § 250.302 et seq., Chief Judge Joseph S. Lord, III, stated:

"We held the legislatively sanctioned procedures unconstitutional because they permitted invasions of protected rights. Evidence of what defendants did cannot amend what the legislature said they may do. The vice is in permissive activity, not individual activity. Since it was permissive procedures that led to a holding of facial unconstitutionality, I see no relevance to any evidence that these particular defendants may have been constitutional white-hats." Stots et al. v. Media Real Estate Co., et al., 355 F.Supp. 240 (E.D.Pa.1973).

Likewise, whether some of the defendants here are constitutional white-hats is irrelevant. The challenge to these statutes is geared at the permissive procedures; therefore, it is facial. It is the same procedures that form the bond of legal commonality between the plaintiffs and defendants.

The legal and factual issues raised by the representative plaintiffs and defendants to this action include: Whether there was a taking under color of state law; whether it was extrajudicial; whether there was consent; and, whether there was economic justification for the taking. These issues form the crux of the attack on, and the support of, the statutory scheme and are necessarily typical of the claims and defenses of each class.

The representative parties, through their respective counsel, abundantly demonstrated to the Court in the several conferences, hearings, and contacts they have had in this case that they fairly and adequately protected the interests of the rest of the members of their classes.

The plaintiffs claim further that the elements of Rule 23(b)(2) are met in this case. Rule 23(b)(2) states:

"The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

This subdivision was added to Rule 23 in 1966 primarily to afford injunctive or declaratory relief in the civil rights area. 7A Wright and Miller, Federal Practice and Procedure, § 1775 p. 24 (1972) (hereinafter "Wright and Miller").

The opposing parties here are the respective classes. The defendants, as a class, have acted on grounds generally applicable to the plaintiffs' class as a whole. Action or inaction is directed to a class within the meaning of Rule 23(b)(2), even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general ap-

plication to the class. See, Fed.R.Civ.P. 23, Notes of Advisory Committee on the Rules, 28 U.S.C.A. Rule 23. Even the threat of action by the defendants under the challenged statutes satisfies Rule 23(b)(2), since that threat is applicable to the plaintiffs' class as a whole. Likewise, but in a converse manner, the plaintiffs' actions or inactions are on grounds generally applicable to the defendants' class.

The relief sought by the plaintiffs' class is declaratory. A decision on the constitutionality of the statues in question is appropriate and will have a declaratory effect on each class as a whole.

The defendants contend that Rule 23(b)(2) applies only to a plaintiffs' class and ". . . an action to enjoin a class from pursuing or failing to pursue some course of conduct would not fall under Rule 23(b)(2) . . ." Wright and Miller § 1775 pp. 21–22. No cases in support of this contention are given in either the defendants' brief or the commentary cited.

It is presumed by the Court that the rationale behind this interpretation of the rule is for the reason that the less-stringent notice requirements of Rule 23(b)(2), as opposed to Rule 23(b)(3), could cause an unwary member of a defendants' class to be prejudiced if an injunction is entered against him. However, in the case at hand, where the outcome will result solely in a declaration on the constitutionality of certain statutes, there is no possibility of prejudice. The relief sought here is really against the statute, not the defendants. There are a number of cases that courts have in fact applied Rule 23(b)(2) to a defendants' class. See, Commonwealth v. Local 542, Operating Engineers, 347 F.Supp. 268 (E.D.Pa.1972); United States v. Cantrell, 307 F.Supp. 259 (E.D. La.1969); Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 285 F.Supp. 714 (M.D.Ill.1968).

The Court notes that the necessary requirements for a class ac-

tion to be maintained on behalf of the defendants would also be met in this instance under Rule 23(b)(1), since adjudications with respect to the individual members of the defendants' class here will clearly be dispositive of the interests of all the members; and the consequences of the classification under Rule 23(b)(1) and Rule 23(b)(2) are the same. United States v. Cantrell, *supra,* 307 F.Supp. at p. 269 n. 1; see also, Wright and Miller § 1774 p. 17.

## V. *Plaintiffs' Motion to Amend Complaint and Add Parties*

On December 13, 1972, plaintiffs filed a motion, under Fed.R.Civ.P. 15(a), to amend their complaint and to add additional representative parties. The reason for this motion was to provide the Court with a greater variety of factual situations dealing with different stages of the repossession scheme (*e. g.,* not yet repossessed; repossessed but not sold; repossessed, sold and pending deficiency judgment, etc.). Since the underlying factual question is substantial, the Court deemed it proper, for the purpose of insuring an adequate record, that the plaintiffs be allowed to bring in the additional representatives of the class to insure this purpose. Consequently, the Court also deemed it proper, through the plaintiffs' motion, that the defendants, who were the factual counterparts of the additional representative plaintiffs, also be added as representative parties for the purpose of aiding in the defense of their class.

It was argued that Fed.R.Civ. P. 21 is the proper rule for adding parties and not Rule 15(a). Any possible conflicts between the interpretation of these two rules arises only when the amending party acts without leave of Court under Rule 15(a). Otherwise, the same basic standard for adding or dropping parties will apply whether the pleader moves under Rule 15(a) or Rule 21.[25] Since leave of Court was granted here, there was no conflict.

25. Wright and Miller § 1474 p. 387.

## VI. *Intervention by the Commonwealth of Pennsylvania*

 The Commonwealth of Pennsylvania ("Commonwealth"), through its Attorney General, has moved to intervene pursuant to Fed.R.Civ.P. 24 on behalf of the citizens of Pennsylvania, under the doctrine of *parens patriae*.[26] *Parens patriae* is a concept of standing utilized to protect those quasi-sovereign interests, such as "health, comfort, and welfare" of the people, interstate water rights, general economy of the state, etc. See, State of West Virginia v. Chas. Pfizer and Company, 440 F.2d 1079 (2nd Cir. 1971). The contention of the Commonwealth is. that the state statutes in question impair the welfare of the citizens by allowing deprivations of property interests without providing for notice and hearing. The concept of due process is designed to protect the welfare of the people; if it were found to be lacking from a statute which permitted a taking of one's property, it would follow that the welfare of the people would be threatened.[27] Therefore, the Commonwealth's standing under the doctrine of *parens patriae* will be allowed.

Fed.R.Civ.P. 24(a) prescribes the requisites necessary for a party to intervene of right. Fed.R.Civ.P. 23(b) sets the guidelines as to when a Court may allow permissive intervention. For the reasons stated below we choose to exercise our discretion in favor of permitting the Commonwealth's intervention under Rule 24(b).

Rule 24(b) states: "Upon timely application, anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common . . ." The interest of the Commonwealth is purporting to protect, and the interest stemming from the main action involves a common question of law, that is, the repossession of motor vehicles under color of state law. Rule 24(b) further provides: ". . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." As the Court expected, intervention by the Commonwealth here helped to expedite rather than delay the proceedings. The Commonwealth had information necessary to identify the members of the defendants' class and used its resources to aid in giving prompt notice to each member of that class.

Since the Court permitted the Commonwealth to intervene under Rule 24(b), it is not necessary to discuss either their application to intervene of right under Rule 24(a) or the defendants' opposition to same.

## VII. *Findings of Fact and Conclusions of Law*

On March 7, 1973, the Court filed a Memorandum Order governing several pretrial motions. Therein, we rule that the case would be bifurcated; only issues concerning the declaratory or in-

---

26. *Parens patriae* means literally "parent of the country." See, Black's Law Dictionary 1269 (4th Ed. 1951).

27. The field of installment sales financing of motor vehicles was so widespread in Pennsylvania that the main reason the State of Pennsylvania decided to regulate the area was to protect the welfare of its inhabitants:

69 P.S. § 602 "Findings and Declaration of Policy." '

". . . Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the welfare of its inhabitants and to protect its citizens from abuses presently existing in the installment sale of motor vehicles, and to that end exercise the police power of the Commonwealth to bring under the supervision of the Commonwealth all persons engaged in the business of extending consumer credit in conjunction with the installment sale of motor vehicles; to establish a system of regulation for the purpose of insuring honest and efficient consumer credit service for installment purchasers of motor vehicles; and to provide the administrative machinery necessary for effective enforcement."

junctive relief with regard to the constitutionality of the statutes in question were to be entertained by the Court at first. All issues with respect to individual or corporate damage claims or counterclaims were to be postponed until a ruling with regard to the declaratory aspect was made. It is on this basis that the evidence was heard in this matter beginning on April 9, 1973, and continuing for thirteen days of trial.

In a decision declaring the replevin statutes of Pennsylvania and Florida unconstitutional, the United States Supreme Court delineated the situations where it may be proper to postpone notice and the opportunity to be heard until after a seizure is made. "These situations, however, must be truly unusual." [28] These situations are: First, where the seizure is directly necessary to secure an immediate governmental or general public interest; second, where there is a special need for prompt action; third, where the state has kept strict control over its monopoly of legitimate force; and, "the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." [29] The evidence elicited in the case at bar was, in essence, directed to the existence or nonexistence of situation (1) above. That the statute allows a seizure prior to notice or hearing is not in dispute. The issue boils down to: Is the seizure necessary to secure an important governmental or general public interest?

The "general public interest" at stake, according to the defendants' witnesses, lies in the economic and social impact on consumer credit. More specifically, defendants contend that the additional costs to them, if required to give all defaulting debtors notice and an opportunity to be heard prior to repossession, would prohibit them from extending credit to members of the class of low-income, high-risk debtors, who presently can and do obtain credit.

Roger Whiteman, Esq., an attorney with considerable experience in representing motor vehicle finance companies in Pennsylvania, testified that the costs of requiring notice and hearing prior to repossession would range between $475.20 and $512.50 per repossession. These costs include prothonotary's fees, sheriff's fees, attorneys' fees, towing and storage charges, and depreciation. Mr. Whiteman further testified that costs due to an increase in personnel and an increase in "skips" (absconding with or hiding the car) is likely.

Dr. Paul Smith, a professor from the Wharton School of Business, University of Pennsylvania, and a prominent economist, testified that it would be unlikely that the finance companies would be able to pass on these additional costs to the consumer, since 75% to 95% of all motor vehicle installment sales contracts at the present provide for the maximum legal finance charge; and competition among creditors for low-risk paper would preclude a finance company from exacting any additional contribution from the automobile dealer. The net result, he concludes, would be a denial of credit to those high-risk consumers associated with the repossession losses.

The arguments proffered by the defendants here were also made by the defendants in the *Fuentes* case. The Supreme Court rejected this analysis by stating:

> "A prior hearing always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing. But these rather ordinary costs cannot outweigh a constitutional right. See Bell v. Burson, *supra*, at 540–541, 91 S.Ct. 1586 at 1589–1590, 29 L.Ed.2d 90; Goldberg v. Kelly, *supra*, at 261, 90 S.Ct. 1011, at 1016, 25 L.Ed.2d 287. Procedural due process is not intended to promote efficiency

28. Fuentes v. Shevin, *supra*, 407 U.S. at p. 90, 92 S.Ct. at p. 1999.

29. *Id.*, at p. 91, 92 S.Ct. at p. 2000.

or accomodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." [30]

The Court goes on to state further in its Opinion that:

" . . . [T]he aggregate costs of an opportunity to be heard before repossession should not be exaggerated. For we deal here only with the right to an *opportunity* to be heard. Since the issues and facts decisive of rights in repossession suits may very often be quite simple, there is a likelihood that many defendants would forgo their opportunity, sensing the futility of the exercise in the particular case. And, of course, no hearing need be held unless the defendant, having received notice of his opportunity, takes advantage of it." [31]

To elaborate a bit on this observation by the Supreme Court, it is not too difficult to conjure a procedure whereby the debtors could be afforded an opportunity to be heard *en masse*; thereby reducing much of the legal expense hypothesized by Mr. Whiteman.

Even if the expert opinions of the defendants' witnesses went unanswered, this Court would still be hard pressed to decide the issue in favor of the defendants, in light of the Supreme Court's reasoning in *Fuentes*. However, the defendants' opinions that costs would increase so greatly the consumer credit market itself would suffer did not go unanswered. The plaintiffs presented testimony from experts in the field of consumer finance whose opinions differ greatly from those of the defendants' witnesses.

The plaintiffs' evidence focused on a different "general public interest," the elimination of self-help repossession.

One of the plaintiffs' expert witnesses,[32] Dr. David Caplovitz, a professor of sociology at the City University of New York, Hunter College Campus, testified mainly about a study he had conducted and supervised in 1967. His study encompassed examining the circumstances of a sample of debtors, allegedly in default, in the cities of New York, Detroit, Chicago, and Philadelphia. He embodied the results of this study in an as yet unpublished treatise entitled, "Debtors in Default." The results of this study are based upon 1,330 interviews, 251 of which were Philadelphia samples; of these 1,330 interviews, approximately 140 were automobile repossessions.

Dr. Caplovitz found that the reasons for debtor default can be broken down into three categories: inability to pay, unwillingness to pay, and error on part of the creditor.

The first category, inability to pay, is the most common symptom, constituting approximately 70% to 75% of all defaults. The inability arises out of unforeseen circumstances on the part of the debtor, *i. e.*, illness, unemployment, and the like.

The second category, unwillingness to pay, comes as a result of the debtor feeling that he is being victimized by the seller. The debtor often ceases making installment payments when he determines that the seller is failing to live up to his end of the bargain. An example of this type of situation would be where a person buys a car with a mechanical

---

30. *Id.*, at p. 90 n. 22, 92 S.Ct., at p. 1999.

31. *Id.*, at p. 92–93 n. 29, 92 S.Ct. at p. 2000.

32. One of the plaintiffs' expert witnesses, Professor Phillip Shuckman, a professor of law at the Stanford University, testified concerning a documented study he conducted in Connecticut entitled, "Profit on Default: An Archival Study of Automobile Repossession and Resale," 22 Stan.L.R. 20 (1969). After hearing testimony as to this study and its results and after also hearing rebuttal testimony from the defendants concerning Professor Shuckman's findings, it is the conclusion of the Court that the professor's findings have little, if any, relevance on the constitutional question before the Court. It would seem that such a study would be more relevant to a legislative body examining repossession substantively, rather than procedurally.

defect, which despite his efforts the dealer cannot cure. Dr. Caplovitz estimates that this symptom is the cause of default in approximately 20% to 25% of the cases.

The final category, comprising only 2% of all defaults, is the normal margin of error incidental to all businesses which operate on a large volume of billing. It is not unusual that once in a while one John Smith will get two bills while another John Smith will get none.

The import of this aspect of Dr. Caplovitz' study is not that some debtors with valid defenses were not afforded an opportunity to raise them, for the constitutional right of due process does not depend on the existence or non-existence of a valid defense.[33]

The value of the doctor's findings on the issue before the Court is in the weight it adds to the plaintiffs' scale in the balancing test of the potential economic harm to the creditor (and to the credit market) versus the potential harm to the plaintiffs in being denied the constitutional right of due process.

On the crucial question of what the overall effect of a plaintiffs' decision here would have on the consumer credit market, Dr. Caplovitz disagreed with the opinion of the defendants' expert, Dr. Smith. In Dr. Caplovitz' expert opinion, it is entirely too difficult to estimate what the costs of affording due process will be with all of the possible variables involved. He further states that, through his experience over the last ten years in testifying before various Congressional and other committees dealing with consumer finance, he has heard the argument before that ". . . if you enact this reform . . . you will be driving the poor people out of the credit market . . . " Two examples, he cites, of instances where this prophesy was proven false were in the reform of the doctrines of "holder in due course" and "truth in lending." Dr. Caplovitz concludes that the reform urged by the

plaintiffs here will not have any effect on the cost of credit.

It is the finding of this Court that the defendants have failed to show that the repossession of motor vehicles is an "extraordinary situation" that justifies postponing notice and opportunity for a hearing. This type of self-help repossession is not directly necessary to secure an important governmental or general public interest.

Finally, the question of whether the plaintiffs have waived their due process rights by signing the installment sales contract has been raised by the defendants. The contracts the plaintiffs have to sign are all printed form contracts with language in relatively small print, such as:

"In the event the buyer defaults in any payment due hereunder, or fails to comply with any of the terms or conditions hereof . . . or if the seller has reasonable cause to believe that said property is in danger of misuse or confiscation . . . the seller shall have the right, at his or its election, to declare the unpaid balance, together with any other amount for which the buyer shall have become obligated hereunder, to be immediately due and payable.

"Further, in such event, the seller or any sheriff or other officer of the law may take immediate possession of said property without demand, including any equipment or accessories thereto; and for this purpose the seller may in a lawful manner only, enter upon the premises where said property may be and remove same . . . "[34]

The plaintiffs have no power to bargain away any provisions of these contracts. In fact, the dealers who present the contracts on behalf of the financers are not allowed to alter them in any fashion. The buyers are faced with a "take it or leave it" proposition, no matter where they go, if they want to pur-

33. Fuentes v. Shevin, *supra* at p. 87, 92 S. Ct. 1983.

34. Standard form GMAC contract.

chase a motor vehicle through install-ment financing.

In addition, these contracts are pre-dominantly one-sided. They include a number of conditions imposed on the buyer, the noncompliance with which put the buyer in default. Some of these provisions include:

The buyer is prohibited from remov-ing the vehicle out of the county or state where it was purchased without the creditor's written consent.

The creditor has the right to seize the consumer's personal property found in the vehicle without liability for loss.

A disclaimer of all implied or ex-pressed warranties of the vehicle's condition.

A clause binding all of the buyer's heirs or legal representatives to the contract.

There is no question but that these are contracts of adhesion. A buyer's signature to a contract of this type does not amount to a knowing and intelligent waiver of his constitutional rights. See, Swarb v. Lennox, 405 U.S. 191, 92 S. Ct. 767, 31 L.Ed.2d 138 (1972); D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). The courts must indulge every reasonable presumption against such a waiver. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■ Moreover, as the Supreme Court pointed out in *Fuentes*, before a purported waiver of a constitutional right can be shown to have been made knowingly and intelligently, it must be demonstrated that what is waived is *clear*.[35] The motor vehicle installment sales contract simply provides for the right to repossess upon default. There is no mention of a waiver of notice or a prior hearing. What is purported here to be a waiver is no more than a state-ment of the seller's right to repossess upon the occurrence or nonoccurrence of certain events.[36]

■ It is the holding of this Court that the statutes challenged by this ac-tion, 69 P.S. §§ 623–627 and 12A P.S. § 9–503 and § 9–504, are constitutional-ly invalid in that they work a dep-rivation of property without due process of law.

### ORDER

And now, to wit, this 8th day of No-vember, 1973, it is hereby ordered that:

(1) This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1343(3);

(2) Except as otherwise altered by this Order, all Orders of this Court pre-viously entered in this matter are *reaf-firmed*;

(3) The defendants' joint and several motions to dismiss this action are *de-nied*;

(4) The defendants' Chrysler Credit Corporation and Provident National Bank, motion to strike the class action allegations are *denied*;

(5) The motion of Vic Potamkin Chevrolet, Inc., Potamkin Chevrolet, Inc., and Potamkin-Auerbach Chevrolet, Inc., to file brief *amicus curiae* was *granted*, and said brief was given due consideration in reaching the Court's conclusions, as were the briefs of all in-terested parties;

(6) Plaintiffs' request that 69 P.S. §§ 623–627 and 12A P.S. § 9–503 and § 9–504 be declared unconstitutional as being violative of the due process clause of the Fourteenth Amendment of the United States Constitution is *granted*;

(7) The application of the relief granted by this Order shall have pro-spective effect only from the date of this Order;

(8) In those instances where the ex-trajudicial repossession of a motor vehi-cle occurred at a time before the date of this Order, but would under the accom-panying Opinion and Order be deemed an unconstitutional repossession if it oc-

---

35. Fuentes v. Shevin, *supra* at p. 95, 92 S. Ct. 1983.

36. *Id.*, at p. 96, 92 S.Ct. 1983.

curred in the future, such previous repossession, as well as any steps in the repossession, disposition, sale and deficiency judgment process related to that previous repossession, even though some of the steps in the process occur in the future, shall not be entitled to judicial relief, injunctive or otherwise, by reason of the holding of the accompanying Opinion or the within Order;

(9) The injunction sought against William A. Titelman preventing him from transferring title to motor vehicles sold subsequent to a nonconsensual, extrajudicial repossession is *denied*.